Argued and submitted March 26, 1997; resubmitted En Banc February 11, reversed and remanded on appeal; affirmed on cross-appeal April 22, 1998

Lois STRANAHAN,
*Appellant - Cross-Respondent,*

*v.*

FRED MEYER, INC.,
a Delaware corporation,
*Respondent - Cross-Appellant.*

(9110-06504; CA A88372)

958 P2d 854

Gregory Kafoury and Mark McDougal argued the cause and filed the briefs for appellant - cross-respondent.

Charles F. Hinkle argued the cause for respondent - cross-appellant. With him on the briefs were Scott J. Kaplan and Stoel Rives LLP.

RIGGS, J.

Leeson, J. pro tempore, concurring.

Landau, J., dissenting.

**RIGGS, P. J.**

Plaintiff Lois Stranahan brought this action for false arrest against defendant Fred Meyer, Inc. (Fred Meyer), and a jury returned a verdict in her favor for $125,000 in compensatory damages and $2 million punitive damages. After trial, the trial court reduced the punitive damage award from $2 million to $375,000. Both parties have appealed. We reverse on appeal and affirm on cross-appeal.

Before turning to the parties' specific arguments, we must set forth the rather complicated factual and legal context surrounding this case. Because most of the assignments of error concern the denial of Fred Meyer's motion for a directed verdict, we set forth the relevant facts in the light most favorable to Stranahan as the nonmoving party, and give her every reasonable inference that may be drawn from the evidence. *Shockey v. City of Portland*, 313 Or 414, 422-23, 837 P2d 505 (1992), *cert den* 507 US 1017 (1993).

Stranahan has long been a political activist in Oregon, and has promoted her political beliefs through use of the initiative process. This political activity has often involved gathering signatures to put the initiatives she supports on the ballot. Her first signature-gathering efforts to put an initiative on the ballot occurred in the 1940s, and involved lowering the voting age. At the time of the incident at issue in the present case, Stranahan was gathering signatures to put initiatives on the ballot concerning sales taxes and the rights of initiative petitioners. Fred Meyer, a chain of shopping centers, maintains that it has a right to exclude initiative petitioners such as Stranahan from its shopping centers and its property surrounding those shopping centers.

On October 11, 1989, Stranahan and another signature-gatherer, Philip Mitchell, were arrested for trespassing outside a Fred Meyer shopping center at Southeast 82nd and Foster, in Portland. This litigation stems from that arrest.

Stranahan went into the shopping center and notified the manager that she would be petitioning outside for several hours. The manager told her not to come within five steps of the doors, and she agreed. She gathered signatures

for several hours. In the late afternoon, Michael McClendon, an employee of Fred Meyer's security department, was dispatched from Fred Meyer's headquarters and went to the shopping center where Stranahan was petitioning. He had written directions for dealing with initiative petitioners that instructed him to take with him a preliminary injunction that had been issued against Lloyd Marbet in an unrelated matter concerning petitioning on Fred Meyer premises. McClendon ordered Stranahan to leave. Stranahan and Mitchell explained that they had a legal right to be there and showed him a newspaper article about a recent trial court ruling that an initiative petitioner had a constitutional right to petition at a Fred Meyer shopping center. McClendon told Stranahan that if she did not leave, he would call the police and have her taken to jail. Stranahan did not leave.

Parkerson, a police officer, was summoned to the shopping center by Fred Meyer security where he was met by McClendon. McClendon showed Parkerson the Marbet injunction, and told him that it was an injunction against petitioners petitioning on Fred Meyer property. Parkerson asked Stranahan to leave, and she refused to do so. Stranahan was taken into custody and transported to jail. As she was entering the police car, she injured her back while trying to avoid parts of the seats that had blood on them. She later began to have chest pains, and needed to take a nitroglycerine tablet at the police station. She eventually was issued a citation and then released. No criminal charges were pursued against Stranahan because it was the policy of the Multnomah County District Attorney's office at that time not to pursue this type of criminal trespass case against initiative petitioners. Fred Meyer knew about that policy at the time of Stranahan's arrest.

According to McClendon, his orders concerning initiative petitioners were to try to persuade them to leave and, if they would not, to call the police and show them the Marbet injunction. He claimed that he was never to arrest petitioners himself and was not to sign any complaints.[1] McClendon testified that he did not arrest Stranahan and did not ask

---

[1] Although McClendon claimed that a written policy existed, Fred Meyer was unable to produce any written policy in this litigation. A vice president of Fred

Parkerson to arrest Stranahan.[2] Parkerson, however, testi-
fied that Stranahan had been arrested by McClendon. The
citation that Parkerson issued indicated that Stranahan had
been arrested by McClendon.

John Velke, a vice president of Fred Meyer, was
aware of the practice of dispatching security personnel to
locations where citizens were petitioning, using the unre-
lated Marbet injunction to try to make the petitioners leave,
and showing the injunction to police officers. Velke acknowl-
edged that it might be misleading if police officers were led to
believe that the injunction applied to petitioners not con-
nected with the Marbet matter. Velke testified that Fred
Meyer stopped using the Marbet injunction in that manner
in 1990. Velke testified that it had always been the policy of
Fred Meyer not to arrest initiative petitioners. However, evi-
dence was introduced that Mr. DeHahn, head of Fred Meyer
security, had instructed a store manager to place an initia-
tive petitioner under citizen's arrest on December 31, 1988.
Evidence also was introduced that DeHahn had testified in
1988, in previous litigation concerning the rights of initiative
petitioners to petition at Fred Meyer shopping centers, that
he had ordered the arrests of initiative petitioners. Evidence
was introduced that Robert Cornutt, also with Fred Meyer
security, had testified in another case some three months
after Stranahan's arrest that it was company policy to arrest
initiative petitioners.

Kellie Petersen, another initiative petitioner, testi-
fied that she had been arrested while petitioning at a Fred
Meyer shopping center in Oregon City, that her case had
gone to trial on September 29, 1989, and that she had been
acquitted on the ground that she had a constitutional right to

Meyer who was one of McClendon's supervisors, John Velke, testified that he was
not aware of any such written instructions. However, he was impeached with a
prior statement that he believed that "there were written instructions about what
to do in the event petitioners came on our property, and that included the aspects
of the injunctions, what to do with the injunctions."

[2] McClendon stated during a deposition that he had never arrested an initia-
tive petitioner, and had never signed any documents indicating that he was arrest-
ing a petitioner. However, evidence was introduced at trial that, fewer than two
weeks after Stranahan's arrest, McClendon signed a custody report concerning the
arrest of another initiative petitioner, Kellie Petersen, that stated: "I have arrested
the defendant for the charges listed."

petition at the shopping center in question. Approximately three weeks after her acquittal (and shortly after Stranahan's arrest at issue in this case), Petersen attempted to gather signatures on a petition outside a Fred Meyer shopping center in Portland and was arrested again. She was handcuffed and taken to jail, but the charges were dismissed. Several months later, Cherie Holenstein, who had previously been arrested for petitioning at a Fred Meyer shopping center and eventually had her conviction overturned on appeal,[3] returned to the same shopping center where she previously had been arrested. She was again arrested for gathering signatures on an initiative petition. In February 1992, Petersen again attempted to gather signatures on an initiative petition at a Fred Meyer shopping center. Fred Meyer personnel presented Petersen with a set of petitioning rules that purportedly were issued by a state circuit court. Those rules indicated that only two petitioners could be present, that they had to give 24 hours notice before petitioning, that they had to pay a $50 deposit, and that they could not get up from their table. This document also stated: "The Circuit Court of the State of Oregon shall have continuing jurisdiction to modify and enforce these rules, in the event of a change of circumstances or allegations of rule violation." Petersen was told that the rules were a court order. Petersen, however, had with her a copy of the actual court order concerning petitioning at Fred Meyer shopping centers, which allowed up to four petitioners, did not require a $50 deposit, did not require petitioners to stay at a table, and did not require 24 hours notice. When Petersen presented the Fred Meyer personnel with the real court order, they left her alone.

Multnomah County District Attorney Michael Schrunk met in 1988 and 1989 with representatives of Fred Meyer, expressing his view that initiative petitioners were not criminals, that his office was busy with murders, rapes, and armed robberies, and suggesting that Fred Meyer resolve its disputes with initiative petitioners through civil rather than criminal processes. He agreed to pursue one criminal case (the *Cargill* case discussed at length below), but

---

[3] Holenstein and Stranahan were among the six defendants in *State v. Cargill*, 100 Or App 336, 786 P2d 208 (1990), *aff'd by an equally divided court* 316 Or 492 (1993), discussed below.

indicated that his office would not pursue this type of criminal trespass case until it received an appellate ruling concerning initiative petitioners' constitutional rights. Stranahan's arrest, as well as Petersen's 1989 arrest in Portland, occurred during this period when the District Attorney's office was not prosecuting this type of trespass case.

A vice president of Fred Meyer, Cheryl Perrin, testified that Fred Meyer had never permitted initiative petitioning in its shopping centers, except on one occasion when it sponsored a ballot measure to allow sales of liquor at its shopping centers. She testified that Fred Meyer did not reevaluate that policy in light of the Oregon Supreme Court's decision in *Lloyd Center v. Whiffen*, 307 Or 674, 773 P2d 1294 (1989) (discussed below).[4] She testified that in the past Fred Meyer had allowed voter registration drives and food drives for the needy at its shopping centers. At trial in this case, she denied that Fred Meyer had decreased these community activities in order to avoid having to permit initiative petitioning at its shopping centers. However, she was impeached with her testimony from a prior trial that indicated that Fred Meyer had banned such community activities in its shopping centers because it was concerned that, if it allowed such activities, it might be obligated to allow initiative petitioning.

In the past decade, Oregon law concerning initiative petitioning at shopping centers has been developing. The facts recited above must be viewed in the context of that law. Before Stranahan's arrest, several appellate decisions had been handed down concerning initiative petitioning in shopping centers. In February 1988, this court decided *Lloyd Corporation v. Whiffen*, 89 Or App 629, 750 P2d 1157 (1988), *aff'd on other grounds* 307 Or 674, 773 P2d 1294 (1989). That case involved the efforts of the Lloyd Center, a large shopping center, to obtain injunctive relief against initiative petitioners gathering signatures on its property. The trial court issued an injunction enjoining the defendants "from entering upon plaintiff's private property to exercise their expressions of

---

[4] In a deposition given in 1991, the Chairman of the Board and Chief Executive Officer of Fred Meyer, Bob Miller, stated that he had no knowledge of any Oregon law that recognized the constitutional rights of petitioners, and that he believed that Fred Meyer had a right to exclude petitioners from its properties. The current Chief Executive Officer, Cyril Green, testified that Fred Meyer still has a policy against petitioning at any of its shopping centers.

opinion or to gather signatures in the initiative and referendum process without plaintiff's permission or consent." *Whiffen*, 89 Or App at 631. This court reversed on the ground that such an injunction to enforce the plaintiff's property rights could inhibit the defendants' constitutional rights of expression protected under Article I, section 8, of the Oregon Constitution.[5] *Id.* at 634. In May 1989, the Oregon Supreme Court issued its decision in that case. On review, the court did not find it necessary to reach the question of whether initiative petitioners had a constitutional right to gather signatures at shopping centers such as the Lloyd Center. Rather, the court based its decision that the plaintiff was not entitled to injunctive relief on equitable considerations. Injunctive relief, the court stated, is equitable and discretionary, and is not necessarily available upon a showing of trespass. *Whiffen*, 307 Or at 680-84 (*Whiffen I*). The court recognized the strong public interest in facilitating the initiative process, and further noted that the signature-gathering process itself "is a form of political speech." *Id.* at 684. The court concluded that that public interest would be seriously injured by an injunction as broad as the one issued in that case. *Id.* at 685-87. The court further concluded that a narrower injunction, imposing time, place and manner restrictions on the defendants' petitioning activities, would suffice. The court, however, emphasized that its decision was based on principles of equity and not of constitutional law: "[A]ny residual legal issues may well be left to plaintiff's remedies at law." *Id.* at 688.

Shortly after the Oregon Supreme Court's decision in *Whiffen I*, it revisited the issue of initiative petitioning at shopping centers in *Fred Meyer, Inc. v. Roberts*, 308 Or 169, 777 P2d 406 (1989), decided in July 1989. That case concerned the accuracy of a ballot title prepared by the Attorney General describing a proposed initiative measure that would have amended the Oregon Constitution to allow signature-gathering activities in shopping malls and outside of pedestrian entrances to buildings open to the public. The Attorney

---

[5] Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

General's ballot title stated that the measure would *protect* such petitioning activity. Fred Meyer challenged the accuracy of the ballot title, arguing that the language implied that the constitutional amendment would protect an existing right. The court agreed, stating that *"Whiffen* clearly does *not* stand for the proposition that there is a 'right' to gather petition signatures on all 'premises open to the public.'" *Fred Meyer*, 308 Or at 174 (emphasis in original). The court observed that "the state of the law is in issue and a motivating reason for mounting this initiative effort." *Id.*

Thus, at the time of Stranahan's arrest, this court had recognized that petitioners have a right under Article I, section 8, of the Oregon Constitution, to gather signatures at the Lloyd Center. The Oregon Supreme Court, while expressing no opinion on that constitutional question, had indicated that broad injunctive relief prohibiting petitioning would not be appropriate given the important public interests involved in the initiative process, and further had indicated that the law was unsettled.

As noted above, before the arrest at issue in this case, the Multnomah County District Attorney had decided to pursue a test case concerning criminal trespass charges against initiative petitioners. That case was *State v. Cargill*, 100 Or App 336, 786 P2d 208 (1990), *aff'd by an equally divided court* 316 Or 492 (1993). In *Cargill*, the six criminal defendants had been arrested for soliciting signatures on initiative petitions outside of a Fred Meyer shopping center in southeast Portland. The criminal defendants argued that they could not be prosecuted because their petitioning activity was constitutionally protected under Article I, section 8, and Article IV, section 1, of the Oregon Constitution.[6] This court noted that, under the criminal trespass statute,[7] the state has the burden to prove that an order to leave was "lawful" if the defendant has raised a defense that he or she was engaged in a constitutionally protected activity.[8] *Cargill*, 100 Or App at 340. This court concluded:

---

[6] Article IV, section 1, of the Oregon Constitution, concerns the process by which voters may initiate laws and constitutional amendments.

[7] ORS 164.205 provides the operative definition governing second-degree criminal trespass: "To fail to leave premises that are open to the public after being lawfully directed to do so by the person in charge."

[8] *State v. Dameron*, 316 Or 448, 853 P2d 1285 (1993), followed a similar analysis.

"Petitioners were engaged in a constitutionally protected activity. The interference with Fred Meyer's property interest was minimal or non-existent. Prosecuting defendants for criminal trespass for refusing to obey a direction to leave the entrance of the store under these circumstances would render inadequate the people's opportunity to function in their legislative role and would violate Article IV, section 1." *Id.* at 348.

*See also Lloyd Center v. Whiffen*, 315 Or 500, 849 P2d 446 (1993) (*Whiffen II*) (Article IV, section 1, of the Oregon Constitution, confers rights to gather signatures on initiative petitioners in common areas of large shopping centers, subject to reasonable time, place and manner restrictions).

Stranahan brought this action against Fred Meyer, claiming false arrest and seeking compensatory and punitive damages.[9] A jury awarded Stranahan compensatory and punitive damages, and the trial court subsequently reduced the punitive damage award to three times the amount of compensatory damages. Stranahan appeals the reduction of the punitive damage award; Fred Meyer cross-appeals, assigning as error the trial court's denial of its motion for a directed verdict as well as several evidentiary rulings. We turn first to Fred Meyer's arguments concerning the trial court's denial of its motion for a directed verdict.

The tort of false arrest occurs when a person is unlawfully detained by another. *See generally Christ v. McDonald*, 152 Or 494, 52 P2d 655 (1936). Once the plaintiff has demonstrated that the detention occurred, the law presumes that the detention was unlawful until the contrary is shown. *Easton v. Hurita*, 290 Or 689, 692, 625 P2d 1290 (1981). The defendant in a false arrest action must plead and prove that an arrest was justifiable or lawful in order to avoid liability. *Christ*, 152 Or at 501.

Fred Meyer argues that the trial court erred in denying its motion for a directed verdict, because it had, in fact, established that Stranahan was committing the crime of trespass at the time of her arrest, and thus her arrest was lawful. Fred Meyer asserts that initiative petitioners do not

---

[9] Some of the procedural background of this case is discussed in *Stranahan v. Fred Meyer, Inc.*, 129 Or App 247, 878 P2d 1123, *rev den* 320 Or 271 (1994).

have a constitutional right to gather signatures at the shopping center at issue in the present case, because that shopping center is not the type of shopping center described in *Whiffen II, Cargill, State v. Dameron,* 316 Or 448, 853 P2d 1285 (1993), and similar cases. In order to address this argument, we must examine the various cases that describe the types of shopping centers at which initiative petitioners may lawfully gather signatures. The Oregon Supreme Court's decision in *Whiffen II* discusses petitioning rights in "large shopping centers such as the Lloyd Center." 315 Or at 514. *See also Dameron,* 316 Or at 459 (quoting same language; reversing convictions because state failed to establish that the Raleigh Hills Fred Meyer shopping center at issue in that case was not such a shopping center where petitioners had a constitutional right to gather signatures: "[T]he sum total of the evidence in this case presents a picture of premises that are not materially different from [the Lloyd Center].").

In *Cargill*, this court held that initiative petitioners had a constitutional right to gather signatures at a Fred Meyer shopping center. 100 Or App at 344-45. We stated that the shopping center at issue there was the modern replacement for a town square, that it was designed to meet a very wide range of consumer needs, that it had benches and bulletin boards, and that people congregated at its restaurant for conversation and social contact. *Id.* However, this court has emphasized that not all Fred Meyer shopping centers are necessarily required to allow initiative petitioning activity. In *Fred Meyer, Inc. v. McDonald,* 112 Or App 321, 322, 828 P2d 1054, *rev den* 316 Or 382 (1992), the trial court had denied injunctive relief to Fred Meyer against a petitioner on the ground that it was bound by the holding in *Cargill*. This court disagreed, noting that the holding in *Cargill* was limited by its facts: the store in question in *Cargill* was subject to petitioning because it was a "forum for assembly by the community." *Cargill,* 100 Or App at 348. In *Dameron,* the court's considerations included the fact that the Fred Meyer shopping center "is completely surrounded by parking lots that are available for use by anyone visiting the Center for any lawful purpose, *e.g.,* to shop, eat, bank, browse, visit a barber shop, beauty salon, professional offices, day care facility, stroll through the garden center, etc." *Dameron,* 316 Or at

452. In *Safeway, Inc. v. Jane Does 1 through 50*, 141 Or App 541, 545, 920 P2d 168 (1996), this court summarized what is involved in determining whether a shopping center is required to allow initiative petitioning:

"Whether a right exists under Article IV, section 1, to gather signatures for initiative petitioners in the common areas of large privately owned shopping centers open to the public for commercial purposes depends on more than [the size of the shopping center and the type of goods it sells]. In cases in which we and the Supreme Court have held that such a right exists, we have considered nonexclusive factors such as the size and configuration of the premises, its relationship to other businesses in the area, whether the premises are bordered by public or private properties, whether the premises are intersected by public streets and sidewalks, whether the premises and adjoining multiple privately owned businesses open directly onto public areas, and whether there are public transportation stops adjacent to the premises. Also pertinent to the inquiry are the scope of business endeavors that are included in the surrounding area and conducted on the premises, the characteristics of the invitation to the public by the businesses in the area, the availability of areas for the public to congregate for noncommercial purposes, the number of people who frequent the premise and the purposes for which the premises and common areas are used." (Footnote and citations omitted.)

In *Wabban, Inc. v. Brookhart*, 142 Or App 261, 921 P2d 409, *rev den* 324 Or 395 (1996), we applied these criteria in a case involving two Home Base stores. We concluded that initiative petitioners did not have a constitutional right to gather signatures at those locations, for the following reasons:

"We conclude that the sidewalks and parking lots of the San Raphael and Beaverton [Home Base] stores are not the modern-day equivalent of town squares. The scope of noncommercial invitation to these premises is limited. The stores themselves sell only home improvement items. Neither shopping center in which the stores are located provides a broad array of commercial enterprises, nor does either attempt to be a 'one stop' shopping area. There is no evidence that the store's parking lots or sidewalks are places where the public is consistently invited to congregate for noncommercial purposes, nor is there evidence that plaintiff has extended an invitation to the public to use its

sidewalks and parking lots for noncommercial activity by providing areas for the public to congregate or community bulletin boards. The fact that plaintiffs maintain hotdog carts at both stores and that a carnival is held once a year on the other side of the San Raphael shopping center parking lot does not significantly alter the scope of the invitation to the public." *Id.* at 266.

With the criteria set forth in previous cases concerning initiative petitioning at shopping centers in mind, we turn to the present case. The facts, as recited above, are not in dispute. We view the evidence in the light most favorable to Stranahan, and give her every reasonable inference that may be drawn from that evidence. *Shockey*, 313 Or at 422-23. We review the trial court's ultimate legal conclusion concerning the lawfulness of Stranahan's conduct as a matter of law. Fred Meyer asserts on appeal that the trial court should have directed a verdict in its favor on the question whether the shopping center at issue was one at which initiative petitioners may exercise their rights under Article IV, section 1, of the Oregon Constitution. For the reasons that follow, we conclude that the trial court correctly denied Fred Meyer's motion for a directed verdict.

■ The shopping center at issue in this case is approximately 110,000 square feet. That is about the same size as the Raleigh Hills Fred Meyer shopping center discussed in *Dameron*, and significantly larger than the Hawthorne Fred Meyer shopping center discussed in *Cargill*. The shopping center at issue here has parking lots on three sides, and all of the customer entrances open onto the parking lots. The shopping center conducts approximately 18,000 transactions per week through the main checkout stands, excluding sales that occur in the separate departments, such as jewelry and nutrition, which have their own cash registers. It sells a wide range of consumer products, from food and beverages to clothing, sporting goods, automotive goods, electronics, housewares, drugs, and jewelry. It has tenant businesses that provide banking services, shoe repair, and dry cleaning. A beauty salon and a Vista Optical store also are tenants. A separate home improvement center is located in a building across a public street.

Like the shopping center at issue in *Cargill*, the shopping center at issue here is designed to meet a wide range of consumer needs. The shopping center endeavors to provide a wide range of products and services on the premises because it wants its customers to meet all of their consumer needs, and spend all of their consumer dollars, at the shopping center. Fred Meyer has, for its own advantage, extended a broad invitation to the public to come to its shopping center. *Whiffen II*, 315 at 510-11. None of the entrances, including entrances to the tenant businesses, is accessible from a public sidewalk. A public street separates the main shopping center from the home improvement center. A wide array of commercial services is available at this shopping center and in the surrounding area. In sum, the Fred Meyer shopping center at issue here is physically similar to those at issue in *Dameron* and *Cargill*, it is used for similar purposes, and the scope of its invitation to the public is equally broad. This evidence supports the trial court's conclusion that the shopping center at issue here is a "large shopping center," as that term has been used in cases such as *Dameron*. Evidence in the record supports the trial court's conclusion that Fred Meyer did not establish that Stranahan's petitioning activity was unlawful.[10]

■ Fred Meyer next argues that the trial court's conclusion that Stranahan was not committing the crime of second-degree criminal trespass at the time she was arrested violates defendant's constitutional rights under Article I, section 18, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution (taking of property without just compensation), as well as defendant's rights under Article I, sections 3 and 8, of the Oregon Constitution, and the First Amendment to the United States Constitution (freedom of speech and freedom of association). Those arguments, in a nutshell, are that the state violates these constitutional provisions by requiring Fred Meyer to allow Stranahan to

---

[10] We do not pretend that the criteria set forth in our previous cases are easy to apply. The list of factors to be taken into consideration is nonexclusive, and it is not easy to discern a unifying theme from the case law that gives sufficient guidance as to what shopping centers are of the sort at which petitioners may exercise their constitutional rights.

remain on its property against its wishes. There is a fundamental flaw to those arguments. Even if Fred Meyer were correct that its constitutional rights were implicated, *but see PruneYard Shopping Center v. Robins*, 447 US 74, 100 S Ct 2035, 64 L Ed 2d 741 (1980) (rejecting such arguments); *Whiffen II,* 315 Or at 504-06 (same),[11] it does not follow that the state is therefore *required* to criminalize Stranahan's conduct in order to protect Fred Meyer's alleged constitutional rights.

 This case is about false arrest, and thus necessarily is about the crime of second-degree trespass for which Fred Meyer had Stranahan arrested. Fred Meyer did not have a constitutional right to have Stranahan arrested for the crime of second-degree criminal trespass when Stranahan's conduct did not, in fact, violate the criminal trespass law. *See, e.g., Cargill, Dameron.* There is no constitutional right to any particular arrangement of the criminal law. Crimes are offenses against the state and, except as the state may provide by law, individuals do not have any right to arrest or prosecute others. The state could, at its discretion, simply choose to repeal the criminal trespass laws entirely. That also would not violate Fred Meyer's various asserted constitutional rights. The state need not provide Fred Meyer an

---

[11] In *PruneYard*, the Court considered whether a state constitutional provision that allowed individuals to engage in petitioning activity at a privately owned shopping center violated its owner's property rights under the Fifth Amendment. The Court noted that "a State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision." 447 US at 81. Whether a violation of the Takings Clause had occurred depended on "such factors as the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Id.* at 82-83 (citations omitted). The Court concluded that a requirement that individuals be allowed to exercise state-protected rights to petition on shopping center property "clearly" was not an unconstitutional infringement on the property rights of the shopping center's owner. *Id.* at 83. The activities in question would not unreasonably impair the value or use of the property as a shopping center, and time, place and manner restrictions would minimize any interference with the shopping center's commercial functions. *Id.; see also Whiffen II,* 315 Or at 504-06 (following *PruneYard* analysis). The Court also rejected the shopping center's First Amendment claims, noting that the shopping center could expressly disavow any connection with the petitioning activity by the simple expedient of posting signs disclaiming sponsorship of the message and indicating that the petitioners were there by virtue of state law. 447 US at 87; *see also Whiffen II,* 315 Or at 508 (following *PruneYard* analysis on free speech issue).

avenue within the *criminal* code by which it may vindicate its asserted constitutional rights.[12] Fred Meyer's takings, free speech, and freedom of association arguments are not well taken, because they offer no support for defendant's contention that Stranahan's *arrest* was lawful. The trial court did not err in denying defendant's motion for a directed verdict on those grounds.

■ The dissent's reliance on the United States Supreme Court's First Amendment case law for its conclusion that Stranahan was violating the criminal trespass statute is puzzling. 153 Or App at 482-85. While this information is interesting from a historical perspective, it does not directly contribute to an analysis of initiative petitioning activity protected under Article IV, section 1, of the Oregon Constitution, and provides no guidance on the interpretation or application of the criminal trespass or false arrest questions presented in this case. The dissent's reliance on the United States Supreme Court's takings case law is even more puzzling. 153 Or App at 491. The dissent purports to address Fred Meyer's central argument, that Stranahan's arrest was lawful. With no reference to the criminal trespass statute that Fred Meyer claims that Stranahan was violating, the dissent cites several treatises on torts (presumably for the proposition that Stranahan's conduct could have constituted the common-law tort of trespass) and several federal takings cases, then concludes that those sources support its conclusion that Stranahan was violating an Oregon criminal trespass statute at the time of her arrest. 153 Or App at 491-92. Even if Stranahan's conduct were tortious—an issue that is not before this court—it simply does not follow that Fred Meyer could *arrest* her for it. One is subject to arrest for crimes, not torts. Moreover, even if petitioning in shopping centers does implicate Fred Meyer's constitutional rights under the takings clauses of the state and federal constitutions, *but see Whiffen II*, 315 Or at 506-08 (rejecting such arguments), it simply does not follow that Fred Meyer could arrest Stranahan, a private citizen, because its constitutional rights were supposedly being violated by the state. If Fred

---

[12] Property rights may be vindicated through civil actions at law for the tort of trespass, actions for declaratory and injunctive relief, and similar proceedings.

Meyer believed that its property was being taken due to initiative petitioning, it could have initiated an action against the state seeking just compensation. It cannot arrest private citizens who are not violating any criminal statutes. In sum, the main props of the dissent's argument that Fred Meyer was entitled to a directed verdict simply are insufficient to bear the weight of its conclusion that Stranahan was violating a criminal trespass statute by engaging in initiative petitioning activity outside the Fred Meyer shopping center at issue here.

■ Fred Meyer also argues that the ruling that Stranahan's arrest was unlawful violates the equal privileges and immunities provision of Article I, section 20, of the Oregon Constitution, as well as the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[13] Fred Meyer cites no case law in support of those contentions, but simply argues that if it may not arrest petitioners such as Stranahan, while its competitors such as Safeway need not allow initiative petitioning, it is being subjected to unequal treatment. *But see Safeway, Inc.*, 141 Or App at 544 (Safeway was not entitled to blanket injunction prohibiting initiative petitioning at all of its stores; whether petitioners had a constitutional right to petition required a store-by-store analysis). Fred Meyer's argument is not well taken. The law concerning the rights of initiative petitioners to petition in shopping centers is identical whether the shopping center is owned by Fred Meyer, Safeway, or anyone else. The analysis is contingent on the nature of the shopping center itself, not on its ownership. That the law, when applied to the facts, might result in one Fred Meyer shopping center not being able to arrest petitioners for criminal trespass, and one Safeway successfully having petitioners arrested for criminal trespass (or *vice versa*), does not mean that the law is being applied in an unequal manner, in violation of Article I, section 20, or the Fourteenth Amendment. We reject Fred Meyer's arguments that failing to direct a verdict in its favor violated Article I, section 20, of the Oregon Constitution, or

---

[13] Article I, section 20, of the Oregon Constitution, provides: "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

The Fourteenth Amendment to the United States Constitution provides, in part: "[N]or shall any State * * * deny to any person within its jurisdiction the equal protection of the laws."

the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

■ Fred Meyer next contends that holding it responsible for Stranahan's false arrest would violate due process, because the law concerning initiative petitioners' rights was not entirely clear at the time of Stranahan's arrest. Fred Meyer contends that it acted in reliance on several trial court rulings enjoining other initiative petitioners, and argues that liability may not be imposed "for an act that the State of Oregon, acting through its court system, had declared to be lawful." That argument is flawed for several reasons. First, the considerations at play when the question is whether a party is entitled to equitable injunctive relief are quite distinct from the elements of the crime of trespass, as is clear from a comparison of *Whiffen I* with *Dameron*. Second, this court rejected a virtually identical argument in the previous appeal in this case:

> "Defendant relies on a number of trial court decisions that preceded plaintiff's arrest, including the one that the Supreme Court later reversed in *Dameron*, to support its position as to what the law was. However, those decisions, insofar as they are contrary to the appellate courts' later decisions in *Cargill* and *Dameron*, are not relevant to what the law *was* at the time of plaintiff's arrest. The law on October 11, 1989, *was* what the appellate courts later said it was in *Cargill* and *Dameron*, the events of which occurred long before October 11, 1989. The earlier trial court decisions can be relevant to what defendant *thought* the law was. However, that mental state, even if it had been conclusively established, is not a defense to a false arrest action." *Stranahan v. Fred Meyer, Inc.*, 129 Or App 247, 251, 978 P2d 1123, *rev den* 320 Or 271 (1994) (emphasis in original; citations omitted).

Fred Meyer's purported reliance[14] on those trial court decisions does not present a due process problem. Fred Meyer bases its argument on the statement of the United States Supreme Court in *BMW of North America v. Gore*, 517 US 559, 116 S Ct 1589, 1597, 134 L Ed 2d 809 (1996), that a

---

[14] The jury was instructed: "If you find that Fred Meyer had a good faith belief that it had a legal right to treat plaintiff as a trespasser then you may not award punitive damages to plaintiff." The jury awarded plaintiff $2 million in punitive damages.

state could not "punish BMW for conduct that was lawful where it occurred[.]" Fred Meyer, however, has not established that Stranahan's arrest was lawful where (or when) it occurred. Appellate decisions in the first *Whiffen* cases certainly put defendant on notice of the legal issues involved. Fred Meyer was a party in the case of *Fred Meyer, Inc.*, 308 Or at 174, which specifically recognized that the constitutional questions concerning initiative petitioning in shopping centers had not been finally resolved. Moreover, as noted above, the arrest at issue here occurred shortly after another initiative petitioner had been acquitted of charges of criminal trespass stemming from petitioning activities at another Fred Meyer shopping center.[15] Also, the arrest at issue here occurred at a time when Fred Meyer knew that the District Attorney's office would not actually prosecute Stranahan. That in the past Fred Meyer had had some success in obtaining injunctions against certain petitioners does not insulate it from liability for the false arrest of a person who was not bound by any of those injunctions and who was not violating the criminal trespass laws.

■ We also reject Fred Meyer's arguments that "retroactive" application of the "new" law announced by the courts in *Cargill* and *Dameron*, violates due process. Those cases interpreted no new legislative enactments. They did not overrule prior case law, but rather, built on, and logically flowed from, cases that had been decided before Stranahan's arrest. The first two *Whiffen* cases had been decided by the appellate courts at the time of Stranahan's arrest. Perrin, a vice president of Fred Meyer, testified that Fred Meyer had not reevaluated its policy concerning petitioning in light of the Oregon Supreme Court's decision in *Whiffen I*.[16] In 1991, Fred Meyer's CEO stated that he had no knowledge that Oregon recognized constitutional rights of initiative petitioners, and maintained that Fred Meyer had a right to exclude

---

[15] As noted above, Stranahan had with her at the time of her arrest a newspaper article concerning that court ruling. The article stated that the "ruling was being examined by Fred Meyer attorneys."

[16] Of course, there was conflicting evidence of what that policy was. In this case, various witnesses testified that Fred Meyer had a policy against arresting petitioners. That evidence was rebutted by evidence that Fred Meyer did have a policy of arresting petitioners and by evidence that a number of arrests had occurred.

petitioners. Meanwhile, Fred Meyer was actively litigating injunction cases against initiative petitioners, and was pursuing cases such as *Fred Meyer v. Roberts*, concerning the nature and scope of the constitutional rights of initiative petitioners, in the Oregon Supreme Court. This is not a situation where Fred Meyer did not have adequate notice that what the initiative petitioners outside their doors were doing might be constitutionally protected.

■ Fred Meyer next argues that the trial court should have directed a verdict in its favor because no evidence was presented that it arrested Stranahan or instigated her arrest. As noted above, we view the evidence in the light most favorable to the nonmoving party. Sufficient evidence was presented that Fred Meyer's agent, McClendon, either arrested plaintiff or instigated her arrest. Fred Meyer argues that Parkerson independently exercised his own judgment in deciding to arrest plaintiff after being shown the injunction by McClendon, and, by implication, argues that using the injunction in such a manner was not misleading. We reject those arguments. Viewing the evidence in the light most favorable to Stranahan, it may be inferred from Parkerson's testimony and the documentation of the arrest that McClendon himself arrested Stranahan. Alternatively, again viewing the evidence in the light most favorable to Stranahan, it may be inferred that McClendon instigated the arrest by showing Parkerson the Marbet injunction and leading Parkerson to believe that Stranahan was violating that injunction. The trial court correctly denied Fred Meyer's motion for a directed verdict on this issue.

■ Finally, Fred Meyer argues that the trial court should have directed a verdict for defendant on plaintiff's claim for punitive damages, on the ground that plaintiff failed to present evidence of malice. Again, viewing the evidence in the light most favorable to plaintiff, we hold that the evidence in the record is sufficient to create a jury question concerning punitive damages. Fred Meyer argues, based on authority from other jurisdictions, that it should not be subject to liability because it was relying in good faith on previous court orders, *e.g.*, trial court injunctions that it had obtained against other petitioners. While it is undisputed that Fred Meyer was relying on the Marbet injunction to

secure plaintiff's arrest, that reliance need not be seen as "good faith" reliance, particularly in light of the testimony by one of its own vice presidents that using the injunction to cause a police officer to believe that Stranahan was violating the injunction could be misleading. That injunction did not enjoin Stranahan. In particular, the facts surrounding McClendon's use of the injunction and Fred Meyer's knowledge that the Multnomah County District Attorney would not pursue charges against Stranahan for the crime of trespass were sufficient to create a jury question on the issue of punitive damages.

In summary, we reject each of Fred Meyer's arguments that it was entitled to a directed verdict.

Fred Meyer next contends that the trial court abused its discretion in allowing Stranahan to amend her complaint on the day of trial to increase the claim for damages. Stranahan's motion to amend was based on information that she gained in the week preceding the trial. Fred Meyer does not assert that it was prejudiced in any way by this amendment. We review the trial court's decision to allow the amendment for abuse of discretion. Leave to amend shall be "freely given when justice so requires." ORCP 23 A. A court has "ample discretionary authority to allow amendments, provided the proffered amendment does not substantially change the cause of action or interject an entire new element of damage." *Cutsforth v. Kinzua Corp.*, 267 Or 423, 433, 517 P2d 640 (1973). The amendment at issue did not add any new elements or alter the cause of action. Fred Meyer points to no particular prejudice that it suffered as a result of the amendment. *Hagan v. Shore*, 140 Or App 393, 398, 915 P2d 435 (1996). We conclude that the trial court did not abuse its discretion in allowing such an amendment on the day of trial.

We next turn to Fred Meyer's arguments concerning the admissibility of certain evidence. As noted above, evidence was introduced at trial that, some two years after Stranahan's arrest, another initiative petitioner, Kellie Peterson, was shown a document by Fred Meyer personnel that purported to be a court order regulating petitioning. Fred Meyer argues that the evidence was irrelevant to the present case, as well as prejudicial. The trial court held this evidence to be relevant because it "could lead [the jury] to

conclude that Fred Meyer was engaging in a pattern of malicious conduct against individuals who conducted themselves in a manner similar to the plaintiff in this case. And it would bear on the question of punitive damages." We agree with the trial court that this evidence was relevant for those reasons. In determining the propriety and amount of punitive damages, a jury may consider subsequent similar misconduct on the part of a defendant. Fred Meyer argues that its conduct toward Petersen in 1992 was not similar to its conduct toward Stranahan, because it involved a different initiative petitioner, a different store, and no arrest occurred. However, both occurrences at least arguably involved some misrepresentation of the legal effect of a document shown to a petitioner.

Fred Meyer relies on *Vandermeer v. Pacific N.W. Develop.*, 274 Or 221, 230, 545 P2d 868 (1976), for the proposition that, while evidence of other misconduct toward the plaintiff might be relevant, evidence of conduct involving a third party is not relevant. *Vandermeer* does not stand for such a sweeping proposition. In *Vandermeer*, evidence was admitted that the defendant, who had performed a citizen's arrest on plaintiff and others for failing to leave a recreation room, had on another occasion had one of the same individuals arrested for harassment. That evidence was not relevant, the court concluded, because it was admitted for the purpose of explaining why the person arrested was not a troublemaker. *Id.* at 234-35. The subsequent conduct at issue in that case was dissimilar to the previous conduct, and the theory of why it might be relevant was obscure, at best. By contrast, the present case concerns Fred Meyer's actions on two separate occasions toward individuals who were doing the same thing—gathering signatures on initiative petitions. The present case also involves similar conduct on the part of Fred Meyer in allegedly misrepresenting legal documents in an effort to get rid of the initiative petitioners. Because of the similarity between those events, and because subsequent similar conduct is relevant to the question of punitive damages, as discussed below, we are unpersuaded that *Vandermeer* calls for the exclusion of this evidence.

Fred Meyer also argues that the evidence should have been excluded under OEC 404(3), which prohibits evidence of bad acts "to prove the character of a person in order

to show that the person acted in conformity therewith." That evidence was not offered or received for the purpose of demonstrating that Fred Meyer's conduct toward Peterson made it any more or less likely that defendant acted toward Stranahan in the manner it did. As discussed below, one of the issues the jury was asked to decide concerning punitive damages was "the importance to society in deterring similar misconduct in the future." Thus, whether Fred Meyer had, in fact, engaged in similar misconduct after the events at issue in the present case was relevant and necessary information for the jury to consider.

 We next turn to the question whether the evidence nonetheless should have been excluded as overly prejudicial. OEC 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" We review for abuse of discretion a trial court's admission of evidence over an OEC 403 objection. *State v. Reyes*, 143 Or App 594, 602, 924 P2d 866 (1996). "An abuse of discretion occurs when a court exercises its discretion to an end not justified by and clearly against the evidence and reason." *Lutz v. State*, 130 Or App 278, 285, 881 P2d 171 (1994).

 Fred Meyer argues that the evidence was overly prejudicial because the jury might not understand that, during Stranahan's arrest, McClendon's use of the Marbet injunction was "completely proper," and that the later representation of the petitioning rules as a court order to Petersen was simply a "mistake" that had caused no harm to Petersen. Certainly it is true that the jury might not (and in fact apparently did not) view the evidence as defendant portrays it. However, the jury was not required to accept Fred Meyer's explanations of its motives. The question under OEC 403 is whether the evidence at issue is unfairly prejudicial, *i.e.*, whether it would cause the jury to make its decision on an improper basis. We do not find that this evidence would have caused the jury to base its decision on improper factors. We conclude that the trial court did not abuse its discretion in admitting the evidence.

 Fred Meyer also contends that the trial court erroneously admitted evidence that it had discontinued numerous community activities in its shopping centers in order to

keep courts from ruling that initiative petitioning must be allowed because the shopping centers were functioning as public forums. The evidence in question was presented after Perrin, a vice president of public affairs, had testified without objection that Fred Meyer shopping centers in the past had allowed voter registration and had sponsored food drives. When asked if Fred Meyer had changed its policies concerning such community activities because of the possibility that it might be required to allow petitioning activity, Perrin denied that was the motivation for discontinuing those community activities. At that point, Stranahan introduced evidence that Perrin had testified in a prior proceeding in 1992 that Fred Meyer no longer allowed activities such as voter registration and Campfire sales because of its concern that courts might rule that its shopping centers were functioning as public forums.

Fred Meyer argues that the admission of Perrin's prior inconsistent statements was erroneous and prejudicial. Fred Meyer also contends that its policies concerning community activities in 1992 are irrelevant to any issues related to Stranahan's 1989 arrest. The evidence was admissible impeachment evidence under OEC 613(2). Perrin's testimony in the present case was inconsistent with her prior testimony on the subject. Evidence that Fred Meyer *had* changed its policies concerning community activities was admitted without objection. Fred Meyer is arguing, in essence, that, despite the fact that its policy on this issue is relevant, inconsistent statements made by one of its vice presidents on the subject are not relevant. The evidence in question was relevant impeachment evidence.[17] *See, e.g., State v. Burgess*, 145 Or App 334, 338, 930 P2d 869 (1996), *rev den* 325 Or 80 (1997) ("testimony of prior inconsistent statements by a witness are admissible and relevant for the purposes of impeachment of a witness' credibility"). The trial court did not err in admitting this evidence.

We next turn to Stranahan's appeal. As noted, the jury returned a verdict favorable to Stranahan, awarding

---

[17] Defendant also argues that this evidence should have been excluded as unduly prejudicial under OEC 403. Defendant did not make that argument to the trial court, and we will not consider it in the first instance on appeal. ORAP 5.45(2).

$125,000 in compensatory and $2 million in punitive damages. Fred Meyer moved for a judgment notwithstanding the verdict,[18] arguing that the punitive damages award should be set aside or reduced.[19] The trial court reduced the punitive damage award to $375,000, or three times the compensatory damages award, stating that "three times the amount of the award of general damages" was "at the highest end of the range of awards" that could be justified in this case.[20] Stranahan contends that the trial court erred in imposing a requirement that the punitive damage award be proportional to the compensatory damages award.

We agree that punitive damages awards are not evaluated based on a simple formula that compares the ratio of the compensatory damages to the ratio of the punitive

---

[18] ORS 18.537 now provides procedures for reviewing punitive damages awards:

"(1) Punitive damages are not recoverable in a civil action unless it is proven by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others.

"(2) If an award of punitive damages is made by a jury, the court shall review the award to determine whether the award is within the range of damages that a rational juror would be entitled to award based on the record as a whole, viewing the statutory and common-law factors that allow an award of punitive damages for the specific type of claim at issue in the proceeding.

"(3) In addition to any reduction that may be made under subsection (2) of this section, upon the motion of a defendant the court may reduce the amount of any judgment requiring the payment of punitive damages entered against the defendant if the defendant establishes that the defendant has taken remedial measures that are reasonable under the circumstances to prevent reoccurrence of the conduct that gave rise to the claim for punitive damages. In reducing awards of punitive damages under the provisions of this subsection, the court shall consider the amount of any previous judgment for punitive damages entered against the same defendant for the same conduct giving rise to a claim for punitive damages."

That statute, however, was not in effect at the time of the trial in this case.

[19] Plaintiff contends that defendant did not adequately raise the issue whether the punitive damage award should be reduced. We disagree. The rationale behind preservation of error rules is to give parties the opportunity to present their positions, and to give the trial court the opportunity to consider the issue. *See generally State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988). The parties made an extensive record on this issue, and the trial court considered their arguments. The issue is sufficiently preserved.

[20] The trial court offered no explanation of how it arrived at the conclusion that three times the compensatory damages award was an appropriate formula.

damages. The United States Supreme Court has stated that punitive damages must bear a "reasonable relationship" to compensatory damages. *BMW of North America, Inc.*, 517 US at 580, 116 S Ct at 1601 (1996). The Court also has indicated that there should be a "reasonable relationship" between the punitive damages award and the harm that is likely to result from a defendant's conduct, as well as the harm that actually resulted. *Id.* Thus, a punitive damages award 20 times the compensatory damage award might be proper in one case, but a punitive damages award twice the compensatory damages award might be excessive in another case. The Court also has indicated that a higher ratio might "be justified in cases in which * * * the monetary value of noneconomic harm might have been difficult to determine." *Id.*

Oregon courts evaluate punitive damage awards by juries based on the following standard:

> "Was the award of punitive damages within the range that a rational juror would be entitled to award in the light of the record as a whole? The range that a rational juror is entitled to award depends, in turn, on the statutory and common law factors that the jury is instructed and permitted to consider when awarding punitive damages for a given claim."

*Oberg v. Honda Motor Co.*, 320 Or 544, 551, 888 P2d 8 (1995).[21]

In the present case, the jury was instructed as follows:

> "Now, to recover punitive damages, Plaintiff has additionally alleged and must prove in this case by clear and convincing evidence, not just by a preponderance of the evidence but by clear and convincing evidence, that in intentionally initiating or causing Plaintiff's arrest that the Defendant Fred Meyer acted wantonly, that is, acted with a particularly aggravated deliberate disregard of the rights of Plaintiff.

---

[21] Defendant suggests that this court adopt an abuse of discretion standard of review as to whether a trial court properly reduced a punitive damages award. That standard of review does not comport with the Oregon Supreme Court's approach to this issue in *Oberg*: "We are in as good a position as would be the trial court to apply a legal standard to the evidence in the record." *Oberg*, 320 Or at 552.

"\* \* \* \* \*

"Now, punitive damages may be awarded to the plaintiff, in addition to compensatory or actual damages, to punish a wrongdoer and to discourage the defendant and others from engaging in wanton conduct. If you found that the plaintiff is entitled to damages then you must consider whether to award punitive damages.

"In considering punitive damages you must first determine whether Fred Meyer was guilty of wanton misconduct that caused damage to the plaintiff. Wanton misconduct is conduct amounting to a particularly aggravated, deliberate disregard of the rights of others. In order to recover punitive damages the plaintiff must prove that Fred Meyer engaged in such conduct by clear and convincing evidence, that is evidence that enables you to find that the truth of the facts asserted is highly probable.

"If you decide to award punitive damages you may properly consider the following items in fixing the amount. The character of Fred Meyer's conduct, Fred Meyer's motive, the sum of money that would be required to discourage Fred Meyer and others from engaging in such conduct in the future, and the income and assets of Fred Meyer.

"If you decide this issue against Fred Meyer you may award punitive damages although you are not required to do so because punitive damages are discretionary. In the exercise of that discretion you may consider the importance to society in deterring similar misconduct in the future. The amount of punitive damages may not exceed the sum of $2,000,000 on plaintiff's false imprisonment claim.

"If you find that Fred Meyer had a good faith belief that it had a legal right to treat plaintiff as a trespasser then you may not award punitive damages to plaintiff."

■ Thus, by awarding punitive damages, the jury necessarily made a factual finding that Fred Meyer did not have a good faith belief that Stranahan was violating the criminal trespass law at the time it arrested her. We turn to the criteria that the jury was instructed to consider in evaluating Fred Meyer's conduct.

The first of these is the "character of Fred Meyer's conduct." The conduct—the arrest—occurred after several appellate courts had concluded that shopping centers did not

have unlimited rights to remove initiative petitioners from their property. The arrest occurred at a time when Fred Meyer had reason to know that the prosecutor would decline to prosecute the alleged offense. Moreover, Fred Meyer's agent used an injunction that did not enjoin Stranahan in a manner that led a police officer to believe that Stranahan was violating that injunction. The jury reasonably could conclude that Fred Meyer acted in wanton disregard of Stranahan's rights at the time of the arrest. Evidence also demonstrated that Stranahan's arrest was not an isolated event. Other petitioners were subjected to similar treatment, *i.e.*, they were arrested but not prosecuted. Evidence was presented not only that Fred Meyer used the Marbet injunction in 1989 and 1990 against petitioners who were not bound by that injunction, but that in 1992 Fred Meyer presented a petitioner with a set of petitioning rules that purported to be court ordered, but was not.

The next criterion that the jury was instructed to consider was Fred Meyer's motive in having Stranahan arrested. Fred Meyer correctly points out that there was no evidence that it was motivated by animosity toward Stranahan personally. However, that does not mean that there was nothing for the jury to consider in this regard. It is clear that Fred Meyer was motivated by a desire to prevent all petitioning at all of its shopping centers. The jury was required to evaluate that motive in light of the fact that several appellate courts had recognized at the time of Stranahan's arrest that important political rights were at stake where initiative petitioning was concerned, and that prohibitions of initiative petitioning at shopping centers would not necessarily be upheld. In terms of motive, the jury also could consider the contradictory testimony and evidence as to what Fred Meyer's policies toward initiative petitioners actually were. Fred Meyer's witnesses in the present proceeding maintained that it had a policy *not* to arrest initiative petitioners. That testimony was rebutted by evidence that, in other proceedings, Fred Meyer had acknowledged that it *was* its policy to arrest initiative petitioners. That evidence too was relevant to the jury's consideration as to whether Fred Meyer acted in wanton disregard of Stranahan's rights as an initiative petitioner.

The jury was next asked to consider the amount of money that would be required to discourage Fred Meyer and others from engaging in similar conduct in the future, taking into account defendant's income and assets. Fred Meyer has not argued that $2 million is unreasonably excessive in light of its income and assets.

The trial court concluded that a $2 million punitive damage award would violate due process because it would "disproportionately punish[ ] the defendant in relation to other wrongdoers." However, no evidence was presented that any other shopping centers had instigated arrests of initiative petitioners. (It also bears noting that the only two appellate cases concerning criminal trespass charges against initiative petitioners, *Dameron* and *Cargill*, involved Fred Meyer shopping centers.) We are not persuaded that the trial court should have reduced the punitive damages award on that ground.

As noted above, the jury was instructed to consider the importance of deterring similar misconduct in the future. Evidence demonstrated that Fred Meyer's arrest of Stranahan was not an isolated event but was part of an ongoing attempt to discourage and prevent initiative petitioning at its shopping centers. The initiative process, however, is an integral part of the Oregon political process, and initiative petitioning is an important constitutional right. As the Oregon Supreme Court has noted, the process of gathering signatures on initiative petitions "is a form of political speech." *Whiffen I*, 307 Or at 684; *see also Meyer v. Grant*, 486 US 414, 422, 108 S Ct 1886, 100 L Ed 2d 425 (1988) (describing initiative petitioning as "core political speech"). Stranahan was not only falsely arrested while she was exercising that constitutional right, but she was arrested *because* she was exercising that constitutional right. As the Supreme Court has stated, the ratio of punitive damages to compensatory damages may be greater if "the monetary value of noneconomic harm [is] difficult to determine." *BMW of North America*, 517 US at 582, 116 S Ct at 1602. It is indeed difficult to determine the monetary value of a noneconomic harm such as infringement on a constitutional right to engage in the type of political activity at issue here. However, the harm at issue certainly is

not *de minimis*. Arrests in the course of, and because of, constitutionally protected political activity such as initiative petitioning certainly may have a chilling effect on the exercise of the constitutional right involved. Such a chilling effect extends beyond the plaintiff in this case, to every Oregonian who has a right to engage in such protected activity.

In this case, the punitive damages awarded by the jury were 16 times greater than the compensatory damages. The economic harms—the compensatory damages—were not great. The noneconomic harms, to Stranahan's right to participate in the Oregon political process in a manner guaranteed by the Oregon Constitution, were much greater. Given the importance of the right involved, we are unable to say that the jury's award of punitive damages 16 times greater than the relatively small compensatory damage award was not "within the range that a rational juror would be entitled to award in light of the record as a whole." *Oberg*, 320 Or at 551.

Reversed on appeal and remanded with instructions to reinstate the jury's verdict; affirmed on cross-appeal.

**LEESON, J. pro tempore,** concurring.

This action for false arrest and compensatory and punitive damages arose out of Stranahan's attempt to gather signatures for an initiative petition while standing near the door of a Fred Meyer store located at the corner of Southeast 82nd Avenue and Foster Road in Portland. The property on which she stood is in a privately owned Fred Meyer shopping center. Stranahan was arrested for trespass after she was asked to leave the property and refused to do so. A jury awarded Stranahan compensatory and punitive damages.

Central to our resolution of the issues in this appeal is determining whether Stranahan had a right to stand outside a Fred Meyer store on property that is part of a Fred Meyer shopping center to gather signatures for an initiative petition. Decisions of the Oregon Supreme Court make clear that she had a right to do so, subject to reasonable time, place, and manner restrictions. Consequently, I concur only in the result. I write separately to explain why, in my view, the cases on which the lead opinion relies misconstrue the

relevant Oregon Supreme Court cases. In the process, I will explain why the dissent's limitation of the right to gather signatures to situations where that activity is within "the scope of the owner's invitation to the public," 153 Or App at 483, is misconceived.

The Oregon Supreme Court has held that there is a limited right under Article IV, section 1, of the Oregon Constitution, to enter onto the property of a privately owned shopping center that is open to the public for commercial purposes to gather signatures for initiative petitions. Those who do so must act reasonably, quietly, and peaceably. The right to gather signatures for such petitions is subject to reasonable time, place, and manner restrictions imposed by the owner of the shopping center so that the activity of gathering signatures does not interfere with the shopping center's commercial activities.

The starting point for understanding Oregon's approach is *Marsh v. Alabama*, 326 US 501, 66 S Ct 276, 90 L Ed 265 (1946). In *Marsh*, the Court confronted the question of when, under the United States Constitution, private property owners may impose restrictions on the exercise of the public's First Amendment rights of speech and press. The Court adopted the following rule:

> "The more an owner, *for his advantage*, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id*. at 506 (emphasis supplied).

Although the facts of *Marsh* involved a wholly owned company town, nothing in the Court's analysis suggested that the rule applies only in cases involving wholly owned company towns. Indeed, in *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza*, 391 US 308, 316-20, 88 S Ct 1601, 20 L Ed 2d 603 (1968), the Court relied on the rule in *Marsh* when it forbade the owner of a private shopping mall from prohibiting union picketing of a store in the mall. According to the Court, the mall served as the functional equivalent of a town business district, which rendered the mall public for purposes of the First Amendment. *Id*. at 319.

In *Lloyd Corporation v. Tanner*, 407 US 551, 570, 92 S Ct 2219, 33 L Ed 2d 131 (1972), the Court qualified the ruling in *Logan Valley Plaza*, holding that, under the First Amendment, Vietnam War protesters were not entitled to distribute handbills in the privately owned Lloyd Center. In that case, the Court focused on the scope of the invitation to the public:

> "The invitation is to come to the Center to do business with the tenants. * * * There is no open-ended invitation to the public to use the Center for any and all purposes, however incompatible with the interests of both the stores and the shoppers whom they serve." *Id.* at 564-65.

Four years later, the Court overruled *Logan Valley Plaza* in a decision in which it concluded that striking employees of a shoe company warehouse who decided to picket the company's retail stores were not entitled to any First Amendment protection and that shopping centers are not the functional equivalent of town squares. *Hudgens v. NLRB*, 424 US 507, 518-21, 96 S Ct 1029, 47 L Ed 2d 196 (1976). Attention then turned to whether the results would be the same under state constitutions.

In *Robins v. Pruneyard Shopping Center*, 23 Cal 3d 899, 909, 592 P2d 341, 347 (1979), the California Supreme Court held that, under the California constitutional guarantees of free expression, persons soliciting initiative petition signatures have a right to enter a private shopping mall. The California high court explained its decision as follows:

> " 'It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the [shopping center there]. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that *these activities do not interfere with normal business operations* would not markedly dilute defendant's property rights.' " *Id.* at 910-11, 592 P2d at 347-48 (emphasis supplied; citation omitted; brackets in original) (citing *Diamond v. Bland,* 11

Cal 3d 331, 345, 521 P2d 460, 470 (1974) (Mosk, J., dissenting)).

The United States Supreme Court affirmed, notwithstanding its previous decision in *Lloyd*. *PruneYard Shopping Center v. Robins*, 447 US 74, 88, 100 S Ct 2035, 64 L Ed 2d 741 (1980). It explained:

> "Our reasoning in Lloyd * * * does not ex proprio vigore limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution. * * * It is, of course, well established that a State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision." *Id.* at 81 (citations omitted).

The Court concluded that permitting persons "to exercise state-protected rights of free expression and petition on shopping center property clearly does not amount to an unconstitutional infringement of appellants' property rights under the Takings Clause" because there was no evidence that soliciting signatures on petitions unreasonably impaired the value or use of the owners' property as a shopping center. *Id.* at 83. Notably, the "scope of the invitation to the public" reasoning that dominated *Lloyd* is absent in *PruneYard*, presumably because the Court recognized that California could take its own approach to free expression issues.[1]

---

[1] The dissent dismisses the *PruneYard* cases because of the failure of the California Supreme Court and the United States Supreme Court to "explain precisely how to identify the sort of 'shopping center' to which the state constitutional guarantees of free expression apply." 153 Or App at 485. In my view, that criticism is misplaced. The Court explained:

> "Most important, the shopping center by choice of its owner is not limited to the personal use of [the owners]. It is instead a business establishment that is open to the public to come and go as they please. The views expressed by members of the public in passing out pamphlets or seeking signatures for a petition thus will not likely be identified with those of the owner. Second, no specific message is dictated by the State to be displayed on appellants' property. There consequently is no danger of governmental discrimination for or against a particular message. Finally, as far as appears here appellants can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand." *PruneYard*, 447 US at 87.

The Oregon Supreme Court entered the debate in *Lloyd Corporation v. Whiffen*, 307 Or 674, 773 P2d 1294 (1989) (*Whiffen I*). The question in that case was "whether the owner of a privately owned shopping center open to the public for commercial purposes may obtain a declaration of rights and injunction against persons entering the shopping center to obtain petition signatures." *Id.* at 677. Although the parties had framed the issue in constitutional terms under Article I, section 8, the court was able to resolve the case without resort to the Oregon Constitution.[2] The court held that the trial court went too far in issuing an injunction restraining persons from gathering signatures for three initiative petitions. *Id.* at 689. For purposes of understanding the evolution of the rule in Oregon regarding the rights of persons gathering signatures for initiative petitions, *Whiffen I* is significant for three reasons. First, it declared unambiguously that "laws may only regulate, not entirely bar, entry *even on residential property* to reach people on matters of social or community interest." *Id.* at 684 (emphasis supplied). Second, *Whiffen I* recognized that the signature-gathering process involves "a very important public interest," because the signature-gathering process for political petitions is a "fundamental principle" of Oregon government. *Id.* If signature gatherers are denied access to commercial private property, the public interest will sustain "serious injury." *Id.* at 685. Finally, *Whiffen I* acknowledged that the owners of private property are entitled to impose reasonable time, place and manner restrictions on persons who gather signatures for petitions on private property. *Id.* at 684-88.

---

[2] Significantly, the dissent's description of the facts in *Whiffen I*—and its emphasis on the nature of the Lloyd Center's invitation to the public—are from *this* court's characterization, *Lloyd Corporation v. Whiffen*, 89 Or App 629, 631, 750 P2d 1157 (1988), *aff'd on other grounds* 307 Or 674, 773 P2d 1294 (1989), not the Supreme Court's. The Supreme Court's opinion describes the Lloyd Center and then notes that

"[t]he privately owned mall and walkways are designed, decorated, and managed to promote retail business, to please plaintiff's tenants and their customers, clients, and patients, and to encourage prospective customers to come to the Center where they may view and buy merchandise or partake of services."

*Whiffen I*, 307 Or at 677-78. The Supreme Court's description in *Whiffen I* is devoid of reference to any noncommercial invitation to the public.

The rule that I summarized at the outset, 153 Or App at 472, emerged in *Lloyd Corporation v. Whiffen*, 315 Or 500, 849 P2d 446 (1993) (*Whiffen II*). In that case, the Supreme Court endorsed the language in *Marsh* that commonly is accepted as the rule of that case:

> " 'The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.' " *Id.* at 510 (*citing Marsh*, 326 US at 506).

The court added:

> "Although this court is not bound by that statement by the Supreme Court of the United States in our consideration of the questions presented in this case involving the interpretation and application of provisions of the Oregon Constitution, we nevertheless agree with that statement." *Id.* at 510-11.[3]

The *Whiffen II* court also declared that Article IV, section 1, confers on persons seeking signatures on initiative petitions a limited right to go onto private property to which the public has been invited. *Id.* at 511. In reaffirming Oregon's "long-established tradition of respect for the initiative process," the court reasoned that

> "to prohibit the gathering of signatures on initiative petitions in the common areas of large shopping centers such as the Lloyd Center would 'impinge on constitutional rights' conferred on the citizens of this state by the provisions of Article IV, section 1, of the Oregon Constitution. Such

---

[3] Apparently the dissent believes that the Supreme Court's decision in *Huffman and Wright Logging Co. v. Wade*, 317 Or 445, 857 P2d 101 (1993), is relevant to the analysis in this case. The dissent is wrong. In *Huffman and Wright*, one of the issues was whether the First Amendment to the United States Constitution protected the defendants from an award of punitive damages for trespass on the plaintiff's personal property. The court concluded that the First Amendment does not provide the shield that the defendants claimed, because "[d]evotion of private property to public use requires, at a minimum, the owner's invitation to the general public to enter the premises." *Id.* at 461. The Court's citation to *Marsh in that context, a free speech case, is simply irrelevant in this case. In Whiffen II*, the court made clear that it adopted the statement from *Marsh* because in cases arising under Article IV, section 1, of the Oregon Constitution, the rights of private property owners who use their property for commercial purposes are circumscribed by the constitutional rights of signature gatherers.

rights, however, are subject to reasonable time, place, and manner restrictions[.]" *Id.* at 514.

According to the court, its holding in *Whiffen II* was "based largely upon acceptance of the rule of *Marsh v. Alabama*" and its decision in *Whiffen I*. *Id.* The holding also was limited "to the facts of this case, which involve *the common areas* of a large shopping center such as the Lloyd Center." *Id.* (emphasis supplied).

The analysis in *Whiffen II* focused on *where* persons seeking petition signatures were entitled to go. Contrary to the dissent's suggestion, *Whiffen II* did not endorse the proposition that "the scope of the public's right to use private property depends on the scope of the invitation to use it." 153 Or App at 488. Neither did the Supreme Court in *Whiffen II* base its holding on whether "the public has been invited [to the shopping center] for community assembly." *Id.* at 488. As explained above, the rule of *Marsh,* reflected in *Whiffen II*, is that " '[t]he more an owner, *for his advantage*, opens up his property for use by the public in general, the more do his rights become circumscribed.' " *Whiffen II*, 315 Or at 510 (emphasis supplied) (citing *Marsh*, 326 US at 506). The dissent rewrites that rule to mean: The more a property owner, *for the advantage of the public*, opens up his property for use by the public in general, the more do his rights become circumscribed. That simply is not what either *Marsh* or *Whiffen II* says. It is the scope of the invitation to the public to use a shopping center *for the property owner's advantage* that matters when determining whether initiative petitioners may exercise a limited right to gather signatures on private property.

As the lead opinion notes, evidence in the record reveals that the Fred Meyer shopping center in this case

"endeavors to provide a wide range of products and services on the premises because it wants its customers to meet all of their consumer needs, and spend all of their consumer dollars, at the shopping center." 153 Or App at 455.

Fred Meyer has invited the public to its shopping center for its own advantage and in the hope that its customers will give the store all of their shopping dollars. Consequently, under the test of *Marsh*, as adopted in *Whiffen II*, Fred

Meyer's rights are circumscribed by the constitutional rights of the public to seek signatures on initiative petitions.

The court's specific task in *Whiffen II* was to respond to a challenge to the restrictions on petition signature gathering that the Lloyd Center had adopted in the wake of *Whiffen I*. In evaluating the Lloyd Center's time, place and manner regulations, the court applied what was by then a familiar test: whether persons seeking signatures on initiative petitions in the common areas of the Lloyd Center, reasonably regulated, would substantially interfere with the Lloyd Center's commercial enterprise. *Whiffen II*, 315 Or at 519.

Like *Whiffen II, Clackamas Town Center Assoc. v. Wolf*, 315 Or 557, 849 P2d 477 (1993), also involved a challenge to time, place and manner restrictions on persons seeking signatures on initiative petitions. The court again recognized the right of those persons to seek signatures in designated common areas of the Clackamas Town Center, subject to reasonable regulations designed to prevent the signature gathering activity from interfering substantially with the commercial enterprise. *Id.* at 560.

The dissent dismisses the Supreme Court's most recent pronouncement on the subject, *State v. Dameron*, 316 Or 448, 853 P2d 1285 (1993), as representing only the opinion of two justices. 153 Or App at 488 n 7. I disagree that *Dameron* can be dismissed so offhandedly. The issue there was whether the defendant remained unlawfully on the premises of a Fred Meyer shopping center when he stood on the privately owned sidewalk outside an entrance to the store. None of the concurring justices disagreed with the following statement by Justice Van Hoomissen:

> "The dissent argues that there is no state constitutional right to gather petition signatures on private property. The dissent is wrong. *Whiffen II*, [315 Or at 500]; *Clackamas Town Center Assoc.*[, 315 Or at 557.]" *Id.* at 462.

In sum, a lead of the Supreme Court in *Dameron* reaffirmed that the rule of *Whiffen II* remains the law of Oregon, and a lead of that court agreed that a person seeking signatures for

an initiative petition did not remain unlawfully on the premises of a Fred Meyer shopping center by standing on the privately owned sidewalk outside one of the entrances to the store.

To reiterate: The Oregon Supreme Court has recognized that, under Article IV, section 1, of the Oregon Constitution, signature gatherers have a limited right to enter onto the property of a privately owned shopping center that is open to the public for commercial purposes to gather signatures for initiative petitions. Those who do so must act reasonably, quietly and peaceably. The right is subject to reasonable time, place and manner restrictions imposed by the owner of the shopping center so that the activity of gathering signatures does not interfere with the shopping center's commercial activities. Under that rule, there is no question that the lead opinion is correct in concluding that defendant was not entitled to a directed verdict.

The recent case law from this court on which the lead opinion relies to support its conclusion is far narrower than are the Supreme Court's decisions. In 1990, we stated that:

> "It is implicit in Article IV, section 1, that the people must have adequate opportunities to sign the petitions that are necessary for them to act as legislators." *State v. Cargill*, 100 Or App 336, 343, 786 P2d 208 (1990), *aff'd by an equally divided court* 316 Or 492, 851 P2d 1141 (1993).

The Supreme Court agreed with that statement in *Whiffen II*. 315 Or at 512. However, in *Cargill* we also held that:

> "The Fred Meyer store at which defendants were arrested *is a modern replacement for the town square or park*. It is open to the public, and citizens are invited to come and congregate on the premises." 100 Or App at 344 (emphasis supplied).

In that part of the opinion, we did not distinguish between citizens who congregate for commercial or noncommercial purposes. However, in deciding whether signature gatherers for initiative petitions could stand on the sidewalk between the parking lot of the Fred Meyer store at 3805 S.E. Hawthorne in Portland and the store's main entrance, we

focused on the nature of the invitation to use the property and concluded, based on the facts of that case, that:

> "Fred Meyer's invitation to the public was broad and for *more than just commercial activity*. Its premises, by reason of the owner's invitation, became a forum for assembly by the community." *Id.* at 348 (emphasis supplied).

We have continued to apply the tests from *Cargill* without recognizing that, since the Supreme Court affirmed it by an equally divided court in a nonprecedential decision, that court has developed a different rule, explained above, for protecting the limited rights of signature gatherers under Article IV, section 1. In 1996, for example, we acknowledged *Whiffen II* for the proposition that

> " 'prohibit[ing] the gathering of signatures on initiative petitions in the common areas of large shopping centers such as the Lloyd Center would "impinge on constitutional rights" conferred on the citizens of this state by the provisions of Article IV, section 1, of the Oregon Constitution.' " *Wabban, Inc., v. Brookhart*, 142 Or App 261, 264, 921 P2d 409, *rev den* 324 Or 395 (1996) (citing *Whiffen II*, 315 Or at 514).

However, we applied the test of *Cargill*, not *Whiffen II*, in analyzing "[t]he scope of noncommercial invitation to [come to HomeBase]," and in concluding that "the sidewalks and parking lots of the San Raphael and Beaverton stores are not the modern-day equivalent of town squares." *Wabban*, 142 Or App at 266. Whether a commercial enterprise has the characteristics of a town square is a fact-intensive inquiry, as evidenced by the factors we considered in *Wabban*. We employed that same methodology in *Safeway, Inc. v. Jane Does 1 through 50*, 141 Or App 541, 545, 920 P2d 168 (1996), where we identified at least ten "nonexclusive factors" for determining whether a Safeway store was a public forum where members of the public have the right to engage in signature gathering on initiative petitions. The reasoning in those cases fuels the lead opinion's analysis here. 153 Or App at 452-55. In my view, we should have applied the rule of *Whiffen II*, described above, in *Wabban* and *Safeway* and should do so here. Nonetheless, I agree with the result in the lead opinion in this case.

**LANDAU, J.,** dissenting.

At issue in this case is the extent to which Fred Meyer has the right to exclude a member of the public from gathering initiative petition signatures on the premises of its Foster Road store. The precise nature of the public's right to use private property for that purpose has proved to be among the most divisive issues in the appellate courts of this state in recent years. So I suppose that it will come as no surprise that, in this case, the court has produced three opinions expressing three very different views on the matter. It is, however, an issue of exceeding importance, one that I hope will attract the attention of the Supreme Court. In the pursuit of that hope, I offer my dissenting view concerning the lead and concurring opinions and set forth what I believe to be a correct view and application of the controlling law.

The lead opinion approaches the question generally as an exercise in fact matching. It does not attempt to articulate any legal principles by which we can determine whether, in a given case, a private property owner may exclude members of the public from gathering signatures. Instead, it examines certain physical features of the Foster Road store to determine whether that store is "like" the stores in prior cases in which we have held the public has a right to solicit initiative petition signatures on private property.[1] It then concludes that, because the Foster Road store is as large as the stores in those prior cases, it may conclude that, in this case as well, the public has the right to solicit signatures on private property. With due respect, I maintain that constitutional rights are not determined by fact matching, but by the application of constitutional principles on a case-by-case basis. That is the manner in which we have approached these cases in the past, and the lead opinion errs in taking a constitutional short cut.

The concurring opinion takes a different approach. Based principally on a very broad reading of a 1946 United States Supreme Court decision, it contends that the Fred Meyer store in this case is subject to a public right to collect

---

[1] In so doing, the lead opinion appears to treat the issue as one of law. I agree that that is the appropriate standard of review in this case.

initiative petition signatures because Fred Meyer "has invited the public to its shopping center for its own advantage and in the hope that its customers will give the store all of their shopping dollars." 153 Or App at 477. I disagree with the concurrence in two respects. First, in my view, it is premised on an inaccurate reading of seminal United States Supreme Court case law; indeed, it is based on a reading that both the United States Supreme Court and the Supreme Court of this state have rejected. Second, its implications are far-reaching and at odds with the applicable cases. The concurrence, in fact, candidly acknowledges that adoption of its reasoning would necessitate overruling a number of prior decisions of this court.

As I read the case law, Article IV, section 1, of the Oregon Constitution, grants the people a right to collect initiative petition signatures on some private property. Precisely which property is subject to that right depends on the extent to which the private property owner has invited the public to treat the property as public property, that is, to assemble on it for noncommercial purposes. Various factual considerations may reveal a greater or lesser invitational scope, but the focus always is on the extent to which the property owner has encouraged members of the public to assemble for noncommercial purposes. Applying that test to the facts of this case, I conclude that Fred Meyer has demonstrated that its Foster Road store is not subject to the right of the public to gather initiative petition signatures on its premises. Accordingly, I would reverse on Fred Meyer's cross-appeal on that ground and would not reach the other matters that the majority addresses in its opinion.

The starting point for any analysis of the law regarding the right of the public to use private property for the purpose of conducting constitutionally protected political activity is the United States Supreme Court's decision in *Marsh v. Alabama*, 326 US 501, 66 S Ct 276, 90 L Ed 265 (1946). In that case, Marsh was arrested for distributing religious literature on the sidewalk of a suburban "town" owned in its entirety by a private business entity. The town had "all the characteristics of any other American town," except for the fact that it was privately owned. *Id.* at 502. It had

"residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places are situated. A deputy of the Mobile County Sheriff, paid by the company, serves as the town's policeman. Merchants and service establishments have rented the stores and business places on the business block and the United States uses one of the places as a post office. * * * [The town residents] make use of a company-owned paved street and sidewalk located alongside the store fronts in order to enter and leave the stores and the post office. * * * In short the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation."

*Id.* at 502-03. Marsh argued that her arrest violated her constitutional rights of freedom of press and religion. The Court agreed. Writing for a majority of the Court, Justice Black explained that merely because property is held in private ownership does not necessarily mean that it is not subject to public use. Depending on the scope of the owner's invitation to the public, the property may be subject to a public right of use:

"The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. Thus, the owners of privately held bridges, ferries, turnpikes and railroads may not operate them as freely as a farmer does his farm. Since these facilities are built and operated primarily to benefit the public and since their operation is essentially a public function, it is subject to state regulation."

*Id.* at 506 (citation omitted). Because the owners of the company town had given the private space all of the attributes of a public municipality, the Court held, the owners had opened the space broadly for public use. *Id.*

The Court arrived at a similar result, although by different reasoning, in *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza*, 391 US 308, 88 S Ct 1601, 20 L Ed 2d 603 (1968). In that case, members of a union picketed in a parcel pick-up area adjacent to a store located in a large

shopping center. The Court held that the picketers could not be enjoined from exercising their rights of free expression on that private property, because the shopping center was the "functional equivalent" of a downtown business district. *Id.* at 325. Interestingly, the author of the majority in *Marsh* disagreed with the majority in *Logan Valley Plaza*. Justice Black complained that, under *Marsh*, the public has a right to use private space for expressive purposes only when the property has "*all* the attributes of a town," not just the appearance of a shopping center. *Id.* at 332 (Black, J., dissenting) (emphasis in original).

The Court ultimately overruled *Logan Valley Plaza*. In *Lloyd Corp. v. Tanner*, 407 US 551, 92 S Ct 2219, 33 L Ed 2d 131 (1972), the lower court concluded that the Lloyd Center was the functional equivalent of a downtown business district and, on that basis, enjoined the Lloyd Center from preventing members of the public from exercising their First Amendment rights on the premises. The Court reversed, concluding that the lower court erred in focusing on the equivalency of the shopping center with a downtown business district. The Court instead adopted the reasoning of Justice Black's dissent in *Logan Valley Plaza*. Focusing on the scope of the Lloyd Center's invitation to the public, the Court held that, because "[t]here is no open-ended invitation to the public to use the Center for any and all purposes, however incompatible with the interests of both the stores and the shoppers whom they serve[,]" there was no basis for requiring the private property owner to allow its premises to be used by the public for expression purposes. *Id.* at 565.

Then, in *Hudgens v. NLRB*, 424 US 507, 96 S Ct 1029, 47 L Ed 2d 196 (1976), the Court held that members of a striking union did not have the right to picket a store located in a large shopping mall. The Court expressed its intention to "make clear now, if it was not clear before, that the rationale of *Logan Valley* did not survive the Court's decision in the *Lloyd* case." *Id.* at 518.

*Lloyd* and *Hudgens* focused on the extent to which the federal constitution afforded members of the public a right to conduct expressive activities on private property;

they said nothing about the extent to which state constitutions might bear on the matter. The California Supreme Court took on that issue in *Robins v. Pruneyard Shopping Center*, 23 Cal 3d 899, 592 P2d 341 (1979), *aff'd* 447 US 74, 100 S Ct 2035, 64 L Ed 2d 741 (1980). In that case, the state Supreme Court held that, although the First Amendment does not afford members of the public a right to solicit initiative petition signatures, the guarantees of free expression in the California Constitution do. The court, unfortunately, did not provide much in the way of explanation as to the reach of its decision. It emphasized the growing importance of "shopping centers" in an increasingly suburbanized city. *Id.* at 907-09, 592 P2d at 345-47. But it did not explain precisely how to identify the sort of "shopping center" to which the state constitutional guarantees of free expression apply.[2] The United States Supreme Court affirmed, holding that the expansive guarantees of freedom of expression afforded by the California Constitution did not violate the shopping center's owners' property rights under the federal constitution. *PruneYard*, 447 US at 83.[3]

Meanwhile, the issue began to surface in Oregon. In *Lloyd Corporation v. Whiffen*, 89 Or App 629, 750 P2d 1157 (1988), *aff'd on other grounds* 307 Or 674, 773 P2d 1294

---

[2] The concurrence suggests that my criticism of the California Supreme Court opinion in this regard is misplaced. It then quotes from the United States Supreme Court opinion in refutation of the criticism. 153 Or App at 474 n 1. I do not understand how what the United States Supreme Court said answers my concern about the vagueness of the California Supreme Court's opinion. In any event, the portion of the United States Supreme Court opinion that the concurrence quotes says only that the shopping center at issue in *PruneYard* is "a business establishment that is open to the public to come and go as they please[,]" an observation that would hold true for virtually any commercial enterprise. *PruneYard Shopping Center v. Robins*, 447 US 74, 87, 100 S Ct 2035, 64 L Ed 2d 741 (1980).

[3] The lead opinion finds my recapitulation of the United States Supreme Court's First Amendment case law "puzzling" and asserts that "it does not directly contribute to an analysis of initiative petitioning activity protected under Article IV, section 1[.]" 153 Or App at 457. The failure of the lead opinion to recognize the relevance of that case law is precisely one of my complaints with its analysis. The case law, in particular the United States Supreme Court's narrow reading of *Marsh* in *Lloyd* and *PruneYard*, is quite relevant, for in the Oregon Supreme Court's cases describing the activity protected under Article IV, section 1, the court explicitly made reference to, and relied on *Marsh*. *See* text at 487-88, below. Especially in light of the fact that the court has stated—without further explanation— that it is relying on the rationale in *Marsh*, it seems to me fairly important to determine what the United States Supreme Court actually said in that case.

(1989) (*Whiffen I*), the trial court issued an injunction prohibiting members of the public from entering the Lloyd Center to gather initiative petition signatures or otherwise exercise their rights of free expression. We reversed, holding that completely prohibiting the petitioners from collecting signatures interfered with their rights of free expression guaranteed by Article I, section 8, of the Oregon Constitution. We expressly based our opinion on the nature of the Lloyd Center and the broad invitation that it issued to the public to use its premises for public activities:

> "Lloyd Center is large, covers numerous city blocks, contains many separate business and professional establishments and is open to the public. Plaintiff seeks to draw masses of people to it each day, provides large parking areas and seeks to create an environment conducive to shopping. *It has provided interior public walkways and malls, with benches, flower gardens and music designed to encourage the public to windowshop, meet friends, congregate and pass the time. Plaintiff's invitation to the public is broad and for more than just commercial activity.*"

*Id.* at 637 (emphasis supplied). The Supreme Court affirmed, albeit on different, ostensibly nonconstitutional, grounds. *Whiffen I*, 307 Or at 688-89.[4]

In *State v. Cargill*, 100 Or App 336, 786 P2d 208 (1990), *aff'd by an equally divided court* 316 Or 492, 851 P2d 1141 (1993), this court again addressed whether members of the public have a right to exercise their rights of free expression on private property—specifically, another Portland Fred Meyer store. The court this time based its holding on Article IV, section 1, of the Oregon Constitution, by which section the people reserved the powers of initiative and referendum. Even so, the court once again focused on the extent to which the shopping center was open to the public for noncommercial purposes. The court noted that the particular store at issue "is a modern replacement for the town square or park.

---

[4] The concurrence takes me to task for quoting from this court's recitation of the facts and notes that "[t]he Supreme Court's description in *Whiffen I* is devoid of reference to any noncommercial invitation to the public." 153 Or App at 475 n 2. What the concurrence says certainly is true, but it also is of no moment. There was no need for the Supreme Court to mention the scope of the owner's invitation because it did not decide the case on constitutional grounds. This court did.

It is open to the public, and citizens are invited to come and congregate on the premises." *Id*. at 344. After reciting such facts about the characteristics of the store, the court concluded, recalling verbatim its rationale in *Whiffen I*:

> "In this case, Fred Meyer's invitation to the public was broad and for more than just commercial activity. Its premises, by reason of the owner's invitation, became a forum for assembly by the community."

*Id*. at 348.[5]

In *Lloyd Corporation v. Whiffen*, 315 Or 500, 849 P2d 446 (1993) (*Whiffen II*), the Supreme Court first recognized a constitutional right to collect signatures on some private property, under Article IV, section 1. The majority opinion offered an abbreviated explanation of the reach of its new rule; the focus of the court's opinion was on the existence of the right not on its extent.[6] First, it characterized the issue before it as "whether the provisions of Article IV, section 1, confer upon persons seeking signatures on initiative petitions the right to go on private property *to which the public has been invited*." *Id*. at 509-10 (emphasis supplied). Second, the court described the right as applying to *"the common areas* of large shopping centers such as the Lloyd Center." *Id*. at 514 (emphasis supplied). In so doing, the court expressly stated that it relied "largely upon acceptance of the rule" in *Marsh* and the California Supreme Court's opinion in *Pruneyard. Id*.

It must be recalled that the rule in *Marsh* was a narrow one, based on the extent to which the property owner opened its property to public use; as subsequent cases made

---

[5] This is not a novel or revisionist reading of *Cargill. See, e.g., State v. Purdue*, 111 Or App 586, 589 n 2, 826 P2d 1037 (1992) ("In *Cargill*, we held that the constitutional right to circulate an initiative petition under Article IV, section 1, barred prosecution for trespass on private property *when the owner of the property had invited the public to use that particular property for more than commercial activity so as to make the property a public forum*." (emphasis supplied)).

[6] *See, e.g.*, Ian J. McPheron, *From the Ground to the Sky: The Continuing Conflict Between Private Property Rights and Free Speech Rights on the Shopping Center Front Seventeen Years After* Pruneyard, 16 N Ill U L Rev 717, 732 (1996) ("*Whiffen II* did not add much to the substantive analysis of the issues * * * except to increase the number of states that allow access to shopping centers for the initiative process.").

clear, *Marsh* was not based on the extent to which a shopping center served as a modern replacement for a traditional downtown commercial area. The majority in *Whiffen II* emphasized the narrowness of the holding in *Marsh* by quoting from that case its explanation that the scope of the public's right to use private property depends on the scope of the invitation to use it. *Id.* at 510 (quoting *Marsh*, 326 US at 506). It also must be recalled that the California Supreme Court's decision in *Pruneyard* provided no explanation as to *which* properties are subject to the state constitutional right to solicit initiative petition signatures. Indeed, the majority in *Whiffen II* referred to the state court decision in *Pruneyard* for a different purpose; the court quoted from *Pruneyard* the conclusion that allowing members of the public to collect signatures at a shopping center would not interfere substantially with the business of the center. *Id.* at 513 (quoting *Pruneyard*, 23 Cal 3d at 907, 592 P2d at 345). Thus, it is apparent that the court in *Whiffen II* intended its holding to apply not merely to any large shopping center but solely to the common areas in large shopping centers to which the public has been invited for community assembly.

That, at least, has been the manner in which the courts of this state in subsequent cases have construed and applied *Whiffen II*.[7] In *Safeway, Inc. v. Jane Does 1 through 50*, 141 Or App 541, 920 P2d 168 (1996), we declined to determine that all 91 of the plaintiff's Oregon stores are not subject to a public right to collect initiative petition signatures,

---

[7] There is language in *State v. Dameron*, 316 Or 448, 853 P2d 1285 (1993) that recalls the "large shopping center" rationale of *Logan Valley Plaza*. The lead opinion that contains that language, however, is one of six separate opinions, and the case was resolved explicitly on nonconstitutional grounds. *Dameron*, 316 Or at 462 ("Because we decide this issue on a narrow and subconstitutional ground, it is not necessary for this court to draw the line for all time and for all future cases involving claims of constitutional rights to seek signatures on initiative petitions on private property.").

The concurrence complains that I am too "offhanded[ ]" in my reading of *Dameron*. 153 Or App at 478. According to the concurrence, a majority of the court agreed with the lead opinion's rejection of the conclusion "that there is no state constitutional right to gather petition signatures on private property." *Id.* (quoting *Whiffen II*, 316 Or at 462). The observation is correct enough. It is simply beside the point. Four justices may have agreed with the quoted conclusion, but only two agreed on the reason for it.

because of the insufficiency of the factual record regarding those stores. Without purporting to articulate a constitutional test, we described the sort of evidence that would be relevant to the inquiry:

"In cases in which we and the Supreme Court have held that such a right exists, we have considered nonexclusive factors such as the size and configuration of the premises, its relationship to other businesses in the area, whether the premises are bordered by public or private properties, whether the premises are intersected by public streets and sidewalks, whether the premises and adjoining multiple privately owned businesses open directly onto public areas, and whether there are public transportation stops adjacent to the premises. Also pertinent to the inquiry are the scope of business endeavors that are included in the surrounding area and conducted on the premises, *the characteristics of the invitation to the public by the businesses in the area, the availability of areas for the public to congregate for noncommercial purposes, the number of people who frequent the premises and the purposes for which the premises and common areas are used.*"

*Id.* at 545 (emphasis supplied; footnote omitted). I acknowledge that *Safeway* is not terribly clear in its description of the applicable law and that the decision could be read to suggest that the scope of an invitation to use private property as public property is but one of many factors to be taken into account. Any doubt about the role of the scope of invitation in the decision-making calculus, however, was resolved shortly thereafter by our most recent decision on the subject.

In *Wabban, Inc. v. Brookhart*, 142 Or App 261, 921 P2d 409, *rev den* 324 Or 395 (1996), we held that two HomeBase retail outlets are not subject to the public's Article IV, section 1, right to collect initiative petition signatures on private premises. We characterized the nature of the question before us in the following terms:

"The question before us is whether these premises, *by reason of HomeBase's express or implied invitation to the public, are a forum for assembly by the community.*"

*Id.* at 265 (emphasis supplied). It bears emphasis that the foregoing sentence is the manner in which we characterized

the nature of the legal issue before us; it is not simply one of the relevant factors taken out of context.[8] That much is made clear by the fact that, after characterizing the issue as I have quoted it, we described the various considerations, listed earlier in *Safeway*, that bear on the scope of the express or implied invitation to the public. *Id*. After detailing the list of those considerations, we then reached the following conclusions in light of the facts regarding the two stores at issue:

> "We conclude that the sidewalks and parking lots of [the two stores] are not the modern-day equivalent of town squares. *The scope of noncommercial invitation to these premises is limited.* The stores themselves sell only home improvement items. Neither shopping center in which the stores are located provides a broad array of commercial enterprises, nor does either attempt to be a 'one stop' shopping area. *There is no evidence that the store's parking lots or sidewalks are places where the public is consistently invited to congregate for noncommercial purposes, nor is there evidence that plaintiff has extended an invitation to the public to use its sidewalks and parking lots for noncommercial activity by providing areas for the public to congregate or community bulletin boards.*"

*Id*. at 266 (emphasis supplied). We took note of the fact that there were hot dog carts at each store and that each store held a carnival in the parking lot each year. We nevertheless held that such activities did "not significantly alter the scope of the invitation to the public." *Id*. We further noted that, although the stores were surrounded by large parking lots, on which the petition gatherers had attempted to exercise their rights to petition, those premises "are primarily premises that provide parking areas for vehicles and egress and ingress for shoppers." *Id*.

The thread that runs throughout the cases—from *Whiffen I* through *Wabban*—is clear. It is that the public has a right to use private property to gather petition signatures

---

[8] It is also how we characterized *Whiffen I*. *Wabban*, 142 Or App at 265 (describing *Whiffen I* as "holding that signature gatherers could not be enjoined from gathering signatures at the Lloyd Center because the Center's invitation to the public 'was broad and for more than commercial activity' " (quoting *Whiffen I*, 89 Or App at 637)).

only to the extent that the property owner has made the property available to the public as a substitute for a public park or town square for purposes of noncommercial assembly. Such a rule makes sense. It is rooted firmly in the common law relating to trespass. *See generally Restatement (Second) of Torts* §§ 167-69 (1965) (scope of consent to enter private property determines the scope of the defense to trespass action); *Prosser and Keeton on the Law of Torts* 118 (5th ed 1985).[9] It also is congruent with Fifth Amendment takings jurisprudence. *See, e.g., Nollan v. California Coastal Comm'n*, 483 US 825, 831, 107 S Ct 3141, 97 L Ed 2d 677 (1987) (if a state required private property owners "to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, * * * we have no doubt there would have been a taking").[10] It is only in that

---

[9] Oregon follows that basic principle of real property law. Illustrating the point is *State v. Donahue*, 93 Or App 341, 762 P2d 1022 (1988), *rev den* 307 Or 303 (1989). In that case, a police officer followed a power company meter reader onto private property and, while on the property, saw evidence of a crime. Based in part on those observations, the officer obtained a warrant to search the premises. This court held that the observations could not be considered a basis for the issuance of the warrant, because the officer's entry onto the land constituted trespass. In response to the state's argument that there was implied permission to have individuals enter the area near the property owner's meter, we held that:

> "Although we can agree that there must be implied permission for a utility company employe[e] to come on the property, we do not agree that the implied permission constitutes an open-ended waiver of defendant's privacy. The police officer went on the property for the purpose of obtaining evidence of a criminal law violation *and was not acting within the scope of the implied permission for a meter reader to come on the property*."

*Id.* at 345 (emphasis supplied).

[10] In *PruneYard*, the United States Supreme Court held that, although "there has literally been a 'taking'" to the extent that the California Supreme Court required owners of private property to allow public signature gathering on their premises, because the physical invasion was of such a limited nature, no violation of the Fifth Amendment occurred. *PruneYard*, 447 US at 82-84. In contrast, the Court decided two years later in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 102 S Ct 3164, 73 L Ed 2d 868 (1982), that a state law requiring landlords to permit the installation of a tiny cable television connection did constitute a violation of the takings clause of the Fifth Amendment. The Court purported to distinguish its *PruneYard* decision on the ground that the "invasion" in that case was "temporary and limited in nature[.]" *Loretto*, 458 US at 434. The distinction has been criticized as less than persuasive. *See, e.g.*, Laurence H. Tribe, *American Constitutional Law* 599-604 (2d ed 1988) (characterizing the rationale of *Loretto* as "lame" and commenting that the Court had "abandoned" its approach in *PruneYard*); Robert M. DiGiovanni, Note, *Eminent Domain*—Loretto v. Teleprompter Manhattan CATV Corp.: *Permanent Physical Occupation as a Taking*, 62 NCL Rev 153, 159 (1983) (*Loretto* is inconsistent with *PruneYard*).

context that the consideration of the many factors that we have described previously as relevant can be evaluated as a matter of law. Otherwise, we are left with an *ad hoc* evaluation of disembodied "criteria" that leads to a determination of the existence of constitutional rights on the basis of whether one store has the same square footage as another and one has a larger number of tenants than another. Such considerations have no constitutional significance in and of themselves; it is only in light of the invitational scope inquiry that the cases consistently apply that they obtain any relevance.[11]

---

The Oregon Supreme Court appears not to have adopted the United States Supreme Court's distinction of *PruneYard* and *Loretto*. In *GTE Northwest, Inc. v. Public Utility Commission*, 321 Or 458, 900 P2d 495 (1995), *cert den* 517 US 1155 (1996), the trial court declared unconstitutional a Public Utility Commission rule that required GTE to permit other local exchange telephone companies temporarily to "collocate" on GTE property connecting switching equipment. We held that the collocation rule did not constitute a taking under the Fifth Amendment, because the rule allowed only a temporary physical invasion. *GTE Northwest, Inc. v. Public Utility Commission*, 130 Or App 637, 644, 883 P2d 255, *rev'd* 321 Or 458 (1995). The Supreme Court reversed, citing *Loretto*. The court held that we had "misread[ ] the [United States] Supreme Court's 'physical invasion' jurisprudence." *GTE Northwest, Inc.*, 321 Or at 473. According to the Supreme Court, "[t]he *duration* of the 'taking' by physical invasion is not relevant to the determination of whether a 'taking' has occurred." *Id.* (emphasis in original).

If what the Oregon Supreme Court said in *GTE* about *PruneYard* and *Loretto* is correct, then the distinction between *PruneYard* and *Loretto* is a blurry one, indeed; and the Fifth Amendment may pose a more significant constraint on the extent to which state constitutions may permit interference with private property rights than recent cases have suggested. The Oregon Supreme Court seems to be saying that the most trivial of physical invasions—even temporary ones—constitute a taking under the Fifth Amendment. If so, then it seems to follow that requiring property owners to permit uninvited members of the public to use their property to collect petition signatures—even temporarily—would pose a significant takings problem.

The lead opinion finds my references to recent takings cases "puzzling." 153 Or App at 457. It then attempts to demonstrate at length why "it simply does not follow that Fred Meyer could arrest Stranahan, a private citizen, because its constitutional rights were supposedly being violated by the state." *Id.* at 457. In so doing, the lead opinion wastes much ink attacking a position that I do not take. My point is much simpler: The constitutional analysis that I propose—indeed, that I say exists in the case law already—has historical and conceptual roots in the common law of trespass and decisions relating to the federal and state takings clauses. The analysis that the lead opinion applies does not.

[11] The size of a store, for example, has no independent significance. I dare say that a small country store with a pot-bellied stove and a checkers table around which members of the public have gathered for years to discuss the day's events—without spending a dime—very likely would be regarded as a place to which the public has been invited for the purpose of noncommercial assembly. Similarly, the fact that a store may lease space to a tenant, by itself, means nothing. If such factors have relevance to the inquiry at all, it is only to the extent that it follows

The lead opinion demonstrates the very problem. Its entire analysis of the issue is as follows:

"Like the shopping center at issue in *Cargill*, the shopping center at issue here is designed to meet a wide range of consumer needs. The shopping center endeavors to provide a wide range of products and services on the premises because it wants its customers to meet all of their consumer needs, and spend all of their consumer dollars, at the shopping center. Fred Meyer has, for its advantage, extended a broad invitation to the public to come to its shopping center. None of the entrances, including entrances to the tenant businesses, is accessible from a public sidewalk. A public street separates the main shopping from the home improvement center. A wide array of commercial services is available at this shopping center and in the surrounding area. In sum, the Fred Meyer shopping center at issue here is physically similar to those at issue in *Dameron* and *Cargill*, it is used for similar purposes, and the scope of its invitation to the public is equally broad. This evidence supports the trial court's conclusion that the shopping center at issue here is a 'large shopping center,' as that term as been used in cases such as *Dameron*."

153 Or App at 455. Thus, the lead opinion's conclusion rests on (1) the size of the store, (2) the fact that it offers a wide variety of opportunities for consumers to spend their money, and (3) the fact that none of the entrances is accessible from a public sidewalk. The lead opinion never explains the free-standing constitutional significance of those factors either in the abstract or in the factual context of this case. The lead opinion, for example, states that the Foster Road store is "large." How large is large enough to be constitutionally significant? The lead opinion similarly states that the store offers a wide variety of consumer products and attempts to persuade consumers to spend all their dollars on the premises. How wide is wide enough to create a constitutional

that larger shopping centers with multiple tenants are more likely to have common areas to which the public can be invited to assemble for noncommercial purposes. Thus, the Supreme Court's explicit limitation in *Whiffen II* that

"we do not hold that a person pursuing signatures may go 'anywhere one pleases' on the property of the Lloyd Center. *We hold only that such persons may seek such signatures in the common areas of the Lloyd Center*, subject to reasonable time, place and manner restrictions."

*Whiffen II*, 315 Or at 511 (emphasis supplied).

right? Manifestly, considering the factors that the lead opinion does in a constitutional vacuum leads to a decision that cannot satisfactorily be defended.

I turn then to the concurring opinion. As I understand it, the linchpin of the concurrence is the United States Supreme Court's decision in *Marsh*. According to the concurrence, the rule of *Marsh* can be summarized by reference to the Court's observation that:

> " 'The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.' "

153 Or App at 472 (quoting *Marsh*, 325 US at 506). The concurrence places great emphasis on the words "for his advantage":

> "It is the scope of the invitation to the public to use a shopping center *for the property owner's advantage* that matters when determining whether initiative petitioners may exercise a limited right to gather signatures on private property."

153 Or App at 477 (emphasis in original). In the view of the concurrence, it is that very broad reading of *Marsh* that the Supreme Court of this state adopted in *Whiffen II*. Accordingly, the concurrence then concludes that, because there is evidence that Fred Meyer "has invited the public to its [Foster Road] shopping center for its own advantage," Fred Meyer cannot exclude the public from collecting initiative petition signatures at that store. *Id.*

My principal disagreement with the concurrence concerns its premise, that is, its broad reading of *Marsh*. In my view, the concurrence relies unduly on a single sentence extracted from its factual context. The concurrence acknowledges that *Marsh* involved a private landowner that treated its property as public property, but it contends that nothing in the United States Supreme Court's analysis suggests that that is relevant to the inquiry. Such a reading of *Marsh*, however, is at odds with the decision itself, with subsequent United States Supreme Court cases and with our own Supreme Court's reading of the opinion.

As to the *Marsh* decision itself, the quotation on which the concurrence relies is followed by an explanation that makes clear the Court's intentions:

> "Thus, the owners of privately held bridges, ferries, turn-pikes and railroads may not operate them as freely as a farmer does his farm. *Since these facilities are built and operated primarily to benefit the public and since their operation is essentially a public function, it is subject to state regulation.*"

*Marsh*, 326 US at 506 (emphasis supplied). Thus, the focus of the Court's analysis was not—as the concurrence suggests—merely the fact that the private landowner invited the public onto the property for its advantage, but instead that the private landowner invited the public to treat the property essentially as *public* property, to serve, in the Court's words, "a public function."

That reading is borne out by the Court's subsequent cases, as I have endeavored to demonstrate in some detail. Although the Court flirted briefly with a broader interpretation of the decision in *Logan Valley Plaza*, it later overruled *Logan Valley Plaza* and, in its *Lloyd* and *Hudgens* decisions, explained *Marsh* in precisely the terms that I have described. The point is critical, because it defines the state of the law at the time of the Oregon Supreme Court's decision in *Whiffen II* and therefore defines what the court in that a case referred to when it "endorsed" the *Marsh* holding. To conclude that the Oregon Supreme Court actually intended to endorse in *Whiffen II* the *Logan Valley Plaza* view of the *Marsh* decision, as the concurrence suggests, requires an assumption that the court in *Whiffen II* intended to adopt—without any explanation that it was doing so—a view of federal constitutional law that already had been abandoned by the federal courts.

That the Oregon court in *Whiffen II* did not adopt the concurrence's view of *Marsh* also is borne out by subsequent decisions of the Oregon courts. In *Huffman and Wright Logging Co. v. Wade*, 317 Or 445, 857 P2d 101 (1993), the court held that the First Amendment did not preclude an award of punitive damages for the defendants' trespass on private property to protest a logging operation. The court explained:

"[T]he First Amendment does not apply to private property that is not devoted to public use. For an owner of private property to be subject to the proscriptions of the First Amendment, the property must 'assume to some significant degree the functional attributes of public property devoted to public use.' *Central Hardware Co. v. NLRB*, 407 US 539, 547, 92 S Ct 2238, 33 L Ed 2d 122 (1972). Devotion of private property to public use requires, at a minimum, the owner's invitation to the general public to enter the premises. *See Marsh v. Alabama*, 326 US 501, 506, 66 S Ct 276, 90 L Ed 265 (1946) ('The more an owner * * * opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.')."

317 Or at 461. If the concurrence is right about *Marsh*, then the Oregon Supreme Court simply was wrong in *Huffman and Wright Logging Co.* when it said that the First Amendment does not apply to private property unless the property "assume[s] to some significant degree the functional attributes of public property devoted to public use." *Id.* In my view, the Oregon court was entirely correct.

Aside from my disagreement with the concurrence's faulty premise, I am concerned about its consequences. The concurrence contends that the public right to collect initiative petition signatures on private property depends on whether the private property owner opens the property to the public "for his advantage." Thus, in this case, the concurrence concludes that, because there is evidence that "Fred Meyer has invited the public to its shopping center for its own advantage and in the hope that its customers will give the store all of their shopping dollars[,]" Fred Meyer cannot exclude members of the public from the entrance to its Foster Road store. 153 Or App at 477. The same could be said, however, of virtually any commercial enterprise. Any retail store, from a "mom and pop" grocery store, to a "7-Eleven"-type convenience store, to a regional shopping center, invites the public to its premises for its advantage and in the hope that the public will spend as much money there as possible. To be sure, the concurrence is careful to describe its proposed rule of law solely with reference to "shopping centers." My point is that there is no logical justification for limiting the rule in that

fashion, and such an extraordinarily sweeping rule finds no support in either federal or state case law.

In my view, the proper disposition of this case is to examine the legal significance of the facts as we did in *Wabban*, namely, to examine, in light of the factors described in the case law, "whether the premises, by reason of [the owner's] express or implied invitation to the public, are a forum for assembly by the community." *Wabban*, 142 Or App at 265. In that light, the record in this case fails to reveal such an invitation. The Foster Road store does occupy 110,000 square feet. By itself, however, that factor has no significance. The store sits in isolation in the middle of a parking lot. It is not located in a "shopping center" in any reasonable sense of the term. As in *Wabban*, there is no evidence that the parking areas or any other areas are "places where the public is consistently invited to congregate for noncommercial purposes[.]" *Id.* at 266. As in *Wabban*, those areas instead are used exclusively for ingress and egress by patrons. The store does provide a wide variety of consumer products. However, unlike the premises at issue in *Whiffen I, Cargill* and *Whiffen II*, there are no malls, no public benches, no gardens, no theaters, no meeting rooms, no public art displays, no fountains and no public bulletin boards. There are, in fact, none of the "common areas" to which the Supreme Court in *Whiffen II* said the right applies. There is no evidence of a broad invitation to the public to do anything other than purchase consumer goods. Such a limited invitation, in and of itself, is insufficient if the right to gather initiative petition signatures is not to extend to virtually any successful retail enterprise.

In short, in light of a less selective consideration of the relevant factual criteria and in the context of a constitutional rule that focuses on the extent of the premises owner's express or implied invitation to the public, I conclude that, as a matter of law, the Foster Road Fred Meyer store is not subject to the right of the public to gather signatures pursuant to Article IV, section 1. Therefore, I would reverse the trial court on Fred Meyer's cross-appeal on that ground.

Warren, Edmonds and Haselton, JJ., join in this dissent.